## COLEY v. NORTH CAROLINA RAILROAD CO.

(Filed June 7, 1901.)

1. NEGLIGENCE—*Master and Servant—Railroads—Assumption of Risk—Private Acts 1897, Ch. 56.*

  Private Acts 1897, Ch. 56, renders inapplicable the doctrine of assumption of risk in the case of an engineer injured by defective appliances, the defects being known to him.

2. CONTRIBUTORY NEGLIGENCE—*Prudence—Questions for Jury.*

  Whether an engineer was guilty of contributory negligence in using drain pipe as a grab iron, in trying to get upon an engine, is a question for the jury.

3 DAMAGES—*Measure of—Mental and Physical Suffering.*

  The measure of damages for injury of a person is the present cash value of his injury, taking into consideration pain and mental suffering.

MONTGOMERY and COOK, J.J., dissenting.

ACTION by Samuel S. Coley against the North Carolina Railroad Company, heard by Judge W. A. Hoke and a jury, at February Term, 1900, of the Superior Court of WAKE County. From a judgment for the plaintiff, the defendant appealed.

  T. M. Argo, and W. H. Day, for the plaintiff.
  F. H. Busbee, and A. B. Andrews, Jr., for the defendant.

FURCHES, C. J., This is an action for injuries by the defendant road. In the case it is stated that the defendant, North Carolina Railroad, had been leased to the Southern before the injury complained of was received, and that the Southern was in possession and operating the same at that

time. But as no point was made as to this fact on the trial of the case, nor on appeal, we will give it no further attention.

The plaintiff was an experienced railroad man, having been engaged in railroad work for more than twenty years, and had been in the employ of the defendant for the last four years. And on the 14th of June, 1898, while in the employment of the defendant as conductor of the shifting engine, at Goldsboro, he received the injury complained of; that prior, and until the 20th of May, 1898, he had used a regular shifting engine with sloping or turtle-top tender; but on that day the defendant took this engine and tender from Goldsboro and replaced it with an old road engine and tender, unsuited for use as a shifting engine and tender; that his work as switch engineer necessitated his riding on the rear end of the tender much of his time; that he could not successfully do the work of switch conductor without so riding; that besides the tender of the last engine furnished being unsuited for his work, it had no hand-holds, or grab-irons to enable him to raise himself upon its platform with safety, which it was necessary for him to do to enable him to signal the engineer; that he saw and knew this tender had no hand-holds or grab-irons when he received it on the 20th of May, and he knew that it was dangerous to use it without them, but that he used it and continued to use it without such grab-irons, until the 14th of June, when he received the injury complained of; that to supply the place of the grab-irons, or rather because there were no grab-irons, he used the drain-pipes from the top of the tender—these were tubes or hollow cylinders, leading from the top of the tender, to take off the overflowing water, and were never intended to be used as hand-holds. The plaintiff says that he had frequently used them as hand-holds before the day of the injury, though he had used the one on the other side of the tender most; that

on the day of the injury he had driven down to some lumber cars and attached the shifting engine to them, and gave the signal to the engineer to move out. To do this, the engine would have to move backwards, and when he gave the signal to move, he undertook to get on the platform of the tender, and for the want of grab-irons he took hold of the drain-pipe, which gave way (pulled out or broke off), and he fell to the ground and was run over by one of the wheels of the tender; his arm was crushed so badly that it was necessary to amputate it, and he was badly injured otherwise. And he contends that it was no fault of his that he was injured, but that it was caused by the fault and negligence of the defendant in not furnishing him a tender with grab-irons, with which to do his work.

While on the other hand the defendant does not deny but what it was guilty of negligence in not furnishing a tender with grab-irons; it contends that this was a patent defect, seen and known by the plaintiff on the 20th of May, when he received this engine and tender; and by his continuing to use the same from that time to the time of the injury, that was a waiver of any objection on that account, and an "assumption of the risk" of any damage that might result from such defect.

The defendant also contends that the plaintiff was guilty of negligence which contributed to, and was the proximate cause of his injury, and that he can not recover on that account. The defendant also contends that there are errors in the Judge's charge to the jury, in charging what he should not have charged, and by refusing to give special requests of the defendant that he should have given. The defendant also contends that the Judge erred in his instructions to the jury as to the measure of damages, as pointed out in its assignment of errors, as that was the earliest opportunity it had of doing so.

While this case was ably and carefully tried, it is apparent from the record, the prayers for instruction and the argument of counsel on both sides, that the main contention below, as it was in this Court, was as to whether the plaintiff had "assumed the risk" of the defective tender in not having the grab-irons. And this question has given us a great deal of trouble, as we had such a line of cases, commencing at least as far back as *Crutchfield v. Railroad,* 78 N. C., 300; *Johnson v. Railroad,* 81 N. C., 454; *Cowles v. Railroad,* 84 N. C., 312; *Hudson v. Railroad,* 104 N. C., 501; *Pleasants v. Railroad,* 95 N. C., 195, and other cases in our own Reports, besides many cases from other courts, that seem to sustain the contention of the defendant; while there are more recent decisions in our own court, though not directly in point, that seem to sustain a different rule—such as *Greenlee v. Railroad,* 122 N. C., 977; 41 L. R. A., 399; *Troxler v. Railroad,* 124 N. C., 189; 44 L. R. A., 313, and *Lloyd v. Hanes,* 126 N. C., 361.

But after all, it seems that this important contention as to the "assumption of risk" is disposed of by chapter 56, "Private" Laws of 1897, which was not called to our attention in the arguments or briefs, and which reads as follows:

"SECTION 1. That any servant or employee of any railroad company operating in this State, who shall suffer injury to his person, or the personal representative of any such servant or employee who shall have suffered death, in the course of his service or employment with said company, by the negligence, carelessness or incompetency of any other servant, employee or agent of the company, or by any defect in the machinery, ways or appliances of the company, shall be entitled to maintain an action against such company."

"SEC. 2. That any contract or agreement, expressed or implied, made by any employee of said company to waive the benefit of the aforesaid section, shall be null and void."

Commencing with the often cited case of *Priestly v. Fowler,* 3 M. and W., 1, what is known as the Fellow Servant Law had been developed, until it seems to have become to be a hardship on the employees of railroads, where there were so many employees whose rights depend on the action of some other employee. And the Act of 1897, ch. 56, was passed to relieve such employees from what appeared to be a hardship, and oppressive upon them.

And while there had not been uniformity in the different jurisdictions as to what is called the "assumption of risk," it seemed to be well settled by the decisions of this Court (see cases cited above) that where an employee entered into the service of a railroad company using defective machinery, knowing of such defects, or, where he continued in the employment after having such knowledge, without notifying his superiors, and protesting against its continuance, such employee would have been held to have waived such objection, and to have assumed the risk arising from the use of such defective machinery.

This, it seems, was considered by the Legislature a hardship, and oppressive, as the competition was so great for such employment that employees were deterred from making such complaints, lest they might lose their places. So it seems that the Legislature undertook to relieve the employees of this trouble, as it deemed it to be a hardship.. So the Legislature, after providing relief against acts of "fellow servants," enacted as follows, "or by any defect in the machinery, ways or appliances of the company, *shall be entitled to maintain an action against said company."* And by the second section of said act it is provided, "That any contract or agreement, expressed or implied, made by any employee of said company to waive the benefit of the aforesaid section, shall be null and void." The Court has construed this Act, holding it to be constitutional, and giving effect to it so far as

it applied to fellow servants. *Hancock v. Railroad,* 124 N. C., 222; and we see no reason why we should not do so as to the "assumption of risk."

It is agreed that assumption of risk is contractual, either by express terms or by implication; and disputes usually were as to whether the plaintiff contracted by implication or assumption for dangers not existing at the date of employment. And it would seem by this Act that the Legislature intended to put an end to such contentions, by saying in the first section that he shall have a right of action for injuries caused by such defective machinery, and by providing in the second section that he can not waive this right by contract, expressed or implied.

This legislation (Acts 1897, ch. 56) seems to be in the same spirit and in harmony with the Acts of Congress of 1893, ch. 195, Statutes-at-Large, U. S. In that statute it is enacted in section 4 that all railroad companies engaged in interstate commerce shall have grab-irons upon them; and in section 8, the right of action is given to any employee injured for the want of any of the appliances mentioned in said Act—grab-irons being one of those mentioned. And then, said section provides that no employee, by remaining in the employment of such company, shall be deemed to have assumed such risk by remaining in the employment of such railroad company. This is the statute upon which Greenlee's and Troxley's cases are based. And while we do not base our opinion in this case upon this legislation of Congress, but on the Statute of 1897, still we think that this legislation of our State and the construction we are placing upon it, are supported and strengthened by the Act of Congress and the construction put upon it by this and other courts.

In 1880 the English Parliament passed what is called the "Employer's Act," in which the doctrine of fellow servants theretofore existing in England was very much the same as in

this State, and was disposed of very much as it was here by the Act of 1897.  The English Act contains a section which provides that an employee shall not maintain an action against his master for injuries received from defective machinery, "ways," etc., unless he gives notice of such defects to the master or some one superior to him, unless the master already knows of the defect.  In the case of *Thomas v. Quartermain,* 18 Q. B. D., 685, it was shown that the plaintiff was injured by reason of defects known to the master, and it was contended by reason of these negative expressions, used in the statute, they absolved the plaintiff from the doctrine of assumption of risk.  And one member of the Court (Lord Asher) held with this contention of the plaintiff, though the other two members of the Court overruled him in this view of the case.  But the same question was again presented in *Smith v. Baker,* Appeal Cases, Law Reports, House of Lords, 1891, page 325, where the Court was again divided, but where a majority of the Lords, who put their opinion upon the Statute of 1880, agreed with Lord Asher, that the statute did destroy or do away with the implied assumption of risk. We refer to the English Statute, and those cases from the English courts, for the purpose of showing that, while the English courts may not have expressly decided that the English Statute did away with the doctrine of assumption of risk, there was a strong tendency of the courts to hold that way.  And in the case of *Smith v. Baker,* a majority of the Lords who put their opinions upon that statute, so held; and if there could be reason for such a construction upon a statute which did not in terms declare such object, but where the legislative will to that effect had to be found in the negative expressions of the statute, how could we escape such a construction where the legislative intent is manifested in express terms, and in the most emphatic manner ?

We are, therefore, of the opinion that whatever might have

been the proper rule in this State as to whether the plaintiff assumed the risk of operating this defective tender, by remaining in the employment of the defendant, the Statute of 1897, ch. 56, has solved that question, and relieved the plaintiff from the burden of assuming the risk of such defect, if it was on him before.

In putting this construction upon the Act of 1897, it must be understood that the plaintiff is relieved by this Act, or the construction we have put upon it, from the responsibility of his own negligence. But, as we have said, the principal "battle" in this case was as to the assumption of risk, and it was ably conducted on both sides—barring the Statute of 1897—and was ably conducted by the learned Judge who presided at the trial.

The greater part of the record, consisting of prayers for instruction and the Judge's charge, is predicated upon the first issue, the assumption of risk, which are eliminated by the view we have taken of the case. This being so, there is but little more for us to do. The prayers of the defendant, mainly, if not all of them, are addressed to the assumption of risk, and it is not necessary for us to discuss them, after taking this view of the Act of 1897.

The defendant's fifth prayer for instructions was addressed to the plaintiff's using the drain-pipe as a grab-iron. This prayer, it seems, the Court gave, but added the following: "The drain-pipe was not put there for a grab-iron, and there is no negligence imputable to the defendant by reason of the weak condition of the drain-pipe, but the question is left for the jury to say, upon the second issue, whether or not the plaintiff was negligent in taking hold of it, and whether he acted as a prudent man in taking hold of it. That question is left with the jury upon the second issue." This addition is assigned as error, but we see none. The prayer must have been addressed to the second issue, though it does not so state, and we see no error in referring the question to the jury.

COLEY *v.* RAILROAD CO.

As we understand, the question of prudence, and the ideal prudent man, are always a matter for the jury. This seems to have been the ground of the exception, that the Court did not decide the question instead of referring it to the jury.

There is one other exception that we think necessary to notice, and that is the measure of damages. As to this, it seems to us that it would have been proper for the Court to have explained more fully the rule as to the measure of damages, or the manner of ascertaining them; especially as it seems to us that an improper rule had been insisted upon in the closing argument of the plaintiff's counsel. But we see no intrinsic error in what the Court did charge—that the jury should give the plaintiff "the present cash value" of his injury, taking into consideration pain and mental suffering—not allowing anything as a punishment, or punitive damages. The defendant cites but one authority to sustain its assignment of error as to instructions upon the question of damages —*Pickett v. Railroad,* 117 N. C., 616; 30 L. R. A., 257— and we do not think it sustains the defendant's contention. That case is as to a prayer which the Court held to be erroneous, but in passing upon the prayer the Court suggest almost the exact language used by the Court in this case as a proper instruction. It was contended before us in the argument that the jury found their verdict upon the erroneous rule laid down by defendant's counsel, but we have no means, as a court, of knowing that this contention is true, the plaintiff is still living. The verdict does not show that the jury were so governed in finding their verdict. It is far more than the simple calculation of time of expectancy, by the plaintiff's yearly earnings. But they were instructed that they might give the plaintiff damages for pain, suffering, etc. This was not error, and we have no means of knowing how much they allowed for this, and how much they allowed for his earnings. There may have been error in the manner in

which the jury estimated the damages. But if there is, we can not know it, nor does the record, to which we are confined, disclose the error.

Upon the view of the case we have taken, the judgment must be

Affirmed.


MONTGOMERY, J., dissenting. I can not concur in the opinion of the Court. It seems that the General Assembly in the Private Laws of 1897, ch. 56, has deprived the defendant of its plea of assumption of risk. As is said in the opinion of the Court the effect of that legislation in respect to assumption of risk had not been called to the attention of counsel in the cause or to that of the Court; but nevertheless we find upon an examination of the statute that to be its plain construction. But the issue on the "assumption of risk" being eliminated does not prevent the operation of the principle of contributory negligence, and it seems to me that the evidence of the plaintiff himself furnishes such clear and convincing proof that his own negligent act was the direct and proximate cause of his injury, that his Honor should have told the jury that upon his evidence they should respond "Yes" to the second issue. *Neal v. Railroad,* 126 N. C., 634.

There was a by-law of the company in the following words: " 'S.' Every employee must exercise the utmost caution to avoid injury to himself or to his fellows, especially in the switching of cars and in all movements of trains, in which work each employee must look after and be responsible for his own safety. Jumping on or off trains or engines in motion, getting between cars in motion to couple or uncouple them, and all similar imprudences are dangerous and in violation of duty. All employees are warned that if they commit these imprudences it will be at their own peril and risk." The plaintiff knew of that by-law, and with a full knowledge

of what he said himself was an obvious defect in the construction of the tender, to-wit the lack of a grab-iron, got up on the tender while it and the engine were in motion and undertook to lift himself from the cross-step up to a higher platform by grasping a drain-pipe, which, he says himself, he had never examined, and that too with the engine and tender moving backwards, his injury being certain if the pipe should give way.

A prayer for instruction by defendant on the point of the plaintiff's using the grab-iron for the purpose with which he did, was directed to the first issue, and refused on that account. But his Honor undertook to charge the jury in respect to the contributory negligence of the plaintiff and failed to call their attention to the plaintiff's neglect to examine the grab-iron, which, in my opinion, was the most important point in the negligent course and conduct of the plaintiff. Especially is that failure on the part of his Honor an error, when it can be seen from the record that his Honor in speaking to the jury about the time and the circumstances of the seizing of the drain-pipe by the plaintiff, misconceived entirely the evidence of the plaintiff on an important and vital point, and as a consequence failed to instruct the jury properly as to those conditions. His Honor said: "In regard to a violation of a known rule of the company, his (plaintiff's) statement was that the rule was that he should not get on the engine in motion. He says that the engine had not started, but did start after he got up, and he contends that the injury did not result from that, but from his taking hold of the drain-pipe, and that that was the natural thing for him to do, and he asked the jury to so find." The plaintiff had testified that the engine and tender were in motion when he got upon the step; that it was going at about a mile an hour when he got on and about two or three miles and hour when he fell.

There is an exception by the defendant to this misrecital

of the evidence and its effect.   Certainly if the injury was caused from the plaintiff's taking hold of the drain-pipe that was the proximate cause of the injury, and as his Honor had told the jury that the drain-pipe was not made to be taken hold of by the plaintiff, and that they should not consider the drain-pipe in any aspect whatever as connected with the defendant's negligence, the plaintiff's use of it for the purpose with which he did use it was an act of negligence so gross that his Honor should have instructed them to find the second issue "Yes."

In reference to the rule laid down by his Honor as to the measure of damages, I think that it was not sufficiently definite, taken in connection with the rule which counsel of the plaintiff argued to the jury.   I know that a trial Judge is not expected to controvert every erroneous argument made by counsel in the course of the trial, but after that part of the argument referred to in this case, his Honor should have in some way have explained more fully what he meant by the words "the present net money value of such loss incident to his injury."

I think there was error.

COOK, J., dissents.