## COLEY v. NORTH CAROLINA RAILROAD CO.

(Filed December 20, 1901.)

1. NEGLIGENCE—*Assumption of Risk—Master and Servant—Railroads—Acts (Private) 1897, Ch. 56.*

   The use of machinery obviously defective will not prevent a person from a recovery for an injury resulting therefrom, unless the apparent danger is so great that its assumption would amount to a reckless indifference of probable consequences.

2. CONTRIBUTORY NEGLIGENCE—*Questions for Jury—Questions for Court.*

   Whether an engineer is guilty of contributory negligence in using drain-pipe as a grab-iron, in trying to get upon an engine, is a question for the jury.

3. NONSUIT — *Dismissal —Evidence —Construction —Negligence — Verdict—Directing.*

   On a motion for a nonsuit, or its counterpart, the direction of a verdict, the evidence for the plaintiff must be accepted as true and construed in the light most favorable to him.

PETITION to rehear. Petition denied. For former opinion see 128 N. C., 534.

*F. H. Busbee,* for the petitioner.
*T. M. Argo,* and *W. H. Day,* in opposition.

DOUGLAS, J. This case is now before us on a petition to rehear. It was first argued in this Court at the September Term, 1900, and was carried over under *advisari.* At the February Term, 1901, it was re-argued by leave of the Court, and determined, the case being reported in 128 N. C., 534.

We have thus had the advantage of three distinct arguments by able and learned counsel, who have also filed elaborate briefs. With such a presentation of the case, and after care-

ful consideration, we feel compelled to adhere to our former decision.   We do so upon an entire review of its merits, on account of its importance as a precedent, which, we think, takes it out of the strict operation of the rule invoked by the plaintiff and laid down in *Weisel v. Cobb,* 122 N. C., 67, and cases therein cited.   The facts are sufficiently stated in the well-considered opinion of the Chief Justice.

The doctrine of Fellow Servant is generally said to have had its origin in the case of *Priestly v. Fowler,* 3 M. and W., 1, decided in 1837, where the plaintiff had his thigh broken by the breaking down of an overloaded butcher's van, loaded and conducted by a fellow servant.   The doctrine, which was rather inferentially laid down in Priestly's case, was for the first time distinctly enunciated in 1841, in *Murray v. South Carolina R. R. Co.,* 1 McMull., 385, 36 Am. Dec., 268, where a fireman was injured through the negligence of an engineer on the same train.   However, the leading case upon the subject is undoubtedly that of *Farwell v. Boston, etc., R. Co.,* 4 Met., 49, 38 Am. Dec., 339, in which Chief Justice Shaw delivered an elaborate opinion, which has been characterized by a distinguished jurist as "the fountain-head of the common law of England and America on this subject."

The development of the doctrine through judicial construction and the largely increased area of its application caused by the increasing use of dangerous machinery, with a relative increase in the number of serious accidents, suggested the necessity of its material modification. · Some of the States attempted to do so through judicial construction, by the introduction of the rule of vice-principal, while others had ·recourse to special legislation.   Among such statutes that have been most generally cited and most frequently construed, we find the English Employer's Liability Act of 1880, and the subsequent acts of Alabama, Massachusetts, Colorado and Indiana.   All of these acts are more comprehensive than our

own, inasmuch as they are not restricted to railroad companies, but, on the other hand, they all contain certain conditions which materially affect their application. Our statute, on the contrary, is simply an unconditional abrogation of the kindred doctrines of Fellow Servant and Assumption of Risk as applied to railroad companies. It is the act of February 23, 1897, erroneously printed as Chapter 56 of the *Private* Laws of 1897, and is as follows:

*"The General Assembly of North Carolina do enact:*

"SECTION 1. That any servant or employee of any railroad company operating in this State who shall suffer injury to his person, or the personal representative of any such servant or employee who shall have suffered death, in the course of his services or employment with said company, by the negligence, carelessness or incompetency of any other servant, employee or agent of the company, or by any defect in the machinery, ways or appliances of the company, shall be entitled to maintain an action against such company.

"SEC. 2. That any contract or agreement, expressed or implied, made by an employee of said company to waive the benefit of the aforesaid section shall be null and void."

This Court has held this act to be constitutional as far as it applied to fellow servants. *Kinney v. Railroad,* 122 N. C., 961; *Wright v. Railroad,* 123 N. C., 280; *Hancock v. Railroad,* 124 N. C., 222. We see no reason why the remainder of the act is not equally constitutional, as it is necessary to give any practical value to this act itself. It is well settled that the doctrines of Fellow Servant and Assumption of Risk rest entirely upon an implied contract; and if an express contract could be made to take the place of an implied contract, the essential purposes of the act could be practically defeated at the will of the employer.

That such statutes are not repugnant to the Constitution of the United States has been repeatedly decided. The

Kansas statute was sustained in *Railroad v. Mackey,* 127 U. S., 205, where the Court says, on page 210: "But the hazardous character of the business of operating a railway would seem to call for special legislation with respect to railroad corporations, having for its object the protection of their employees as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employees, and no objection therefore can be made to the legislation on the ground of its making an unjust discrimination. It meets a particular necessity, and all railroad corporations are, without distinction, made subject to the same liabilities." This case was quoted and approved in *Railroad v. Herrick,* 127 U. S., 211, sustaining the Iowa statute; in *Railroad v. Pontius,* 157 U. S., 209, and in *Railroad v. Matthews,* 165 U. S., 1. We have, therefore, no hesitation in holding the act of February, 1897, valid in its entirety, and that it deprives all railroad companies operating in this State of the defense of assumption of risk, whether resting in contract, express or implied, and whether pleaded directly or under the doctrine of Fellow Servant.

Beyond this we can not go, as we think that the intent of the statute related simply to the contractual relations existing, expressly or by implication, between the plaintiff and defendant; and that the General Assembly did not intend to forbid the plea of contributory negligence in the real meaning of the term. Some Courts appear to have confused assumption of risk with contributory negligence, by regarding them as equivalent defenses; but they are essentially different in their nature, their origin and their results. Contributory negligence, of course, always involves the fact of *actual* negligence on the part of the plaintiff, while the simple assumption of risk does not of itself imply negligence, which may or may not co-exist. A defective machine carefully handled, or a safe machine carelessly handled, may equally result in

an accident; but the resulting responsibility would be by no means the same. This is especially true since the act of 1897.

As the law now stands, the use of machinery obviously defective will not prevent the plaintiff from a recovery for an injury resulting therefrom, unless the apparent danger is so great that its assumption would amount to a reckless indifference to probable consequences. What is recklessness, depending upon the rule of the prudent man, is, as is said in the former opinion of the Court, a matter of fact for the jury, as it necessarily depends upon the peculiar facts of each case. The best definition we can give, applicable to such cases as that at bar, is that adopted by this Court in *Hinshaw v. Railroad,* 118 N. C., 1047, that the danger of using the defective machine must be not only apparent, but so great that there are more chances against its safe use than there are in favor of it. This risk must be considered in connection with the skill and experience of the plaintiff, as a sailor might with entire safety climb up into the rigging where it would be utter recklessness for a landsman to follow. In all such cases the "personal equation" is an important factor.

It is admitted that at the time of the injury the plaintiff had been in the railroad service for thirty years, in the service of the defendant over four years as a yard conductor, and was fully versed in the duties of his position. It further appears that the regular switch engine, with a sloping tender, was taken away, and a road engine substituted therefor, that had no hand-hold above the platform of the tender. This hand-hold could be used only while he was on the lower step, and yet if he remained on that step he could not see the engineer or signal to him without leaning outward in an uncomfortable and dangerous position. The proper performance of his duties required him to stand upon the platform of the tender, where he could see and be seen, and to get up there he

must pull up by catching hold either of the drain-pipe or the top of the tender. He swears that of the two he considered the drain-pipe the safer as well as the more convenient. Neither had been provided for such use, and if he pulled himself up at all, he was compelled to do so by using something intended for another purpose. He had been using this drain-pipe regularly for such purpose for three weeks, but had used the one on the other side more because the most of his work was on that side. If the drain-pipe had been properly fastened, it would have been safe and he would not have been hurt. These are the most material points of his testimony, and he is largely corroborated by other witnesses. The plaintiff testifies that if the drain-pipe had been in proper condition, it should have held a thousand pounds. Heilig testified that drain-pipes are usually threaded through a nut on the inside, and should support a thousand pounds, if necessary. Lacy, a witness for the defendant, says that drain-pipes, when in proper condition, are very secure, and would hold a man's weight, adding, "When first put in always would." Hill, a witness for the defendant, says that the drain-pipe "would hold a man's weight if in proper condition." Taking this evidence as true, and construing it in the light most favorable for the plaintiff, as we are bound to do on a motion to nonsuit or direction of the verdict, can we say in the light of our own decisions that the plaintiff was guilty of contributory negligence *as a matter of law?* The question is not whether the defendant had placed the drain-pipe there for any such purpose; but whether, when the defendant made it necessary for him to pull up by something, without placing *anything* there for the purpose, the plaintiff was guilty of contributory negligence *per se* in catching hold of a drain-pipe which was apparently secure, which he had been using for three weeks, and which, if in proper condition, could have supported a thousand pounds. It seems to us there can be

but one answer. It was an issue of fact for the jury, and in the absence of any error in his Honor's charge prejudicial to the defendant, we can not disturb the verdict.

It is well settled that on a motion for nonsuit, or its counterpart, the direction of a verdict, the evidence for the plaintiff must be accepted as true, and construed in the light most favorable to him, as the jury might take that view of it if left to them, as they appear to have done in the case at bar. *Avery v. Sexton,* 35 N. C., 247; *Hathaway v. Hinton,* 46 N. C., 243; *State v. Allen,* 48 N. C., 257; *Abernathy v. Stowe,* 92 N. C., 213; *Gibbs v. Lyon,* 95 N. C., 146; *Springs v. Schenck,* 99 N. C., 551; *Hodges v. Railroad,* 120 N. C., 555; *Collins v. Swanson,* 121 N. C., 67; *Purnell v. Railroad,* 122 N. C., 832; *Cable v. Railroad, Ibid,* 892; *Whitley v. Railroad, Ibid,* 987; *Cox v. Railroad,* 123 N. C., 604; *Howell v. Railroad,* 124 N. C., 24; *Cogdell v. Railroad, Ibid,* 302; *Cowles v. McNeill,* 125 N. C., 385; *Brinkley v. Railroad,* 126 N. C., 88; *Moore v. Ry. Co.,* 128 N. C., 455.

In Purnell's case, *supra,* Justice Furches, speaking for the Court, says: "This motion is substantially a demurrer to the plaintiff's evidence, and this being so, and the Court having no right to pass upon the weight of evidence, every fact that plaintiff's evidence proved or *tended* to prove must be taken by the Court to be proved. It must be taken in the strongest light, as against the defendant."

In *Printing Co. v. Raleigh,* 126 N. C., 516, Chief Justice Faircloth, speaking for the Court, says: "The defendant's motion to dismiss the action was equivalent to a demurrer to the evidence, and the plaintiff's evidence will be taken as true, and taken in the most favorable light for him (citing authorities). An appellate Court reviewing a judgment of nonsuit will assume every fact proved, necessary to be proved, when the evidence tends to prove it." This same rule applies even in the Federal Court, where the Judges are permitted

to express an opinion upon the facts, and where the rule as to a direction of the verdict is not so rigid as with us, as will be shown by the following quotations from a long line of cases:

"If the evidence, giving the *plaintiff* every benefit of every inference to be fairly drawn from it, sustained his view, then the direction to find for the defendant was proper." *Kane v. Railroad,* 128 U. S., 91, 94.

"It is only where the facts are such that all reasonable men must draw *the same conclusion from them,* that the question of negligence is ever considered as one of *law* for the Court." *Railroad v. Ives,* 144 U. S., 427.

"In determining whether the plaintiff was so guilty of contributory negligence as to entitle the defendant to a verdict, we are bound to put upon the testimony the construction *most favorable to him."* *Railroad Co. v. Lowell,* 151 U. S., 209, 217.

The inference from the facts must be *"so plain as to be a legal conclusion"* before the question can be withdrawn from the jury. *Railroad Co. v. Egeland,* 163 U. S., 93, 98.

"We see no reason, as long as the jury system is the law of the land and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these (negligence and contributory negligence) as well as others." *Jones v. Railway Co.,* 128 U. S., 443, 445.

"The Court erred in not submitting the question of contributory negligence to the jury, as the conclusion did not follow, *as matter of law,* that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish." *Dunlap v. Railway Co.,* 130 U. S., 652.

(The italics are our own.)

It can not be doubted, and in fact it does not seem to be seriously questioned, that it was negligence on the part of the

defendant to furnish an engine so obviously defective for its intended use, when the defect could have been so easily supplied. In fact, it is questionable whether this case would not come under the rule of continuing negligence, laid down in the cases of Greenlee and Troxler, aside from the act of 1897. *Greenlee v. Railroad,* 122 N. C., 978; *Troxler v. Railroad,* 122 N. C., 903; S. C., 124 N. C., 189; *McLamb v. Railroad,* 122 N. C., 862.

In the celebrated case of *Farwell v. Railroad, supra,* the following significant reservation in the opinion of the Court is found on pages 61 and 62: "In coming to the conclusion that the plaintiff, in the present case, is not entitled to recover, considering it in some measure a nice question, we would add a caution against any hasty conclusion as to the application of this rule to a case not fully within the same principle. It may be varied and modified by circumstances not appearing in the present case, in which it appears that no wilful wrong or actual negligence was imputed to the corporation, and where suitable means were furnished and suitable persons employed to accomplish the object in view. We are far from intending to say that there are no implied warranties and undertakings arising out of the relation of master and servant. Whether, for instance, the employer would be responsible to an engineer for a loss arising from a defective or ill-constructed steam-engine; whether this would depend upon an implied warranty of its goodness or sufficiency, or upon the fact of wilful misconduct, or gross negligence on the part of the employer, if a natural person, or of the superintendent or immediate representative and managing agent, in case of an incorporated company, are questions on which we give no opinion." Does not this contain the germ of the Greenlee case? If so, what would be the use of raising an implied warranty if the law at once rebutted it by an implied assumption of risk?

COLEY *v.* RAILROAD.

We do not think it necessary to add anything more to the opinion of the Court, as delivered by the Chief Justice, as the remaining principles therein decided are too well settled to need further discussion.

It may be that if we were jurors, we would find the plaintiff guilty of contributory negligence as a matter of fact, and not at all unlikely that the recovery would be less. But we are not jurors, and have no right to assume their functions. The plaintiff has a judgment obtained in a Court of competent jurisdiction, which is before us on appeal only as to matters of law. As we find no substantial error in his Honor's charge, or the conduct of the trial, we can not disturb the verdict or reverse the judgment on any view we have as to the mere weight of the evidence.

Petition Dismissed.

Cook, J., dissenting. The decision of the Court is made to turn upon the "Fellow Servant" act of 1897, which is quoted in full in the opinion. The construction placed upon that act, in my opinion, is not warranted by its text or the remedy intended to be provided by the Legislature which passed it. So I will first peruse and consider the act in respect of the remedy intended.

The rule for construing a remedial statute, as taught by Mr. Blackstone, is that there are three points to be considered; the old law, the mischief and the remedy; that is, how the law stood at the making of the act; what the mischief was for which the old law did not provide; and what remedy is provided to cure the mischief. To illustrate his meaning, he instances the restraining statute of 13 Elizabeth, Chap. 10. "By the common law," he says, "ecclesiastical corporations might let as long leases as they thought proper; the mischief was, that they let long and unreasonable leases to the impoverishment of their successors; the remedy applied by the

COLEY *v.* RAILROAD.

statute was by making void all leases by ecclesiastical bodies for longer terms than three lives or twenty-one years."

Applying this rule in construing the act, we find the law (made by judicial construction) to have been, first, that where an employee of a railroad company was injured by the negligence of a fellow servant, the common employer was not responsible for the injury; and, second, that there was no statute or judicial ruling in this State by which an employee could be prevented from contracting with a railroad company to waive his right of action for injuries resulting from defects in the machinery.

The mischief to be remedied was to release a fellow servant from his responsibility for the negligence of a fellow servant; and, second, to secure to the employee the right of action for injuries inflicted on account of defects in the machinery.

The remedy applied by the statute is to create a liability upon the railroad company in favor of an employee for injury inflicted by the negligence of a fellow servant, and to declare null and void any such contract or agreement, express or implied, made for the purpose of waiving the right to maintain an action, (1) from injury resulting from the negligence of a fellow servant, and (2) from injuries resulting from defects in the machinery. An analysis of the statute shows two propositions:

1. To change the relationship existing between fellow servants and make them vice-principal as to each other with respect to injuries resulting on account of their negligence, carelessness or incompetency, and to prevent them from forfeiting their right of action by contract.

2. To prevent an employee from waiving his right of action for injuries received on account of defects in the machinery, ways or appliances; or, in other words, a right of action accrues to a fellow servant, and the right to waive either action by an employee is forbidden.

27——129

These relations being established by the statute, the liability of the railroad company as to furnishing safe and suitable machinery, ways and appliances, and the relationship of the employee and his assumption of risks in the performance of his work remain unchanged. So, I do not understand that it is within the purview of the statute to exempt employee from responsibility for negligence in the use of safe machinery or to license him to voluntarily assume unnecessary risk or hazard at the expense or upon the responsibility of the railroad company. For, if danger or peril exists in the performance of a service, it becomes obvious *first* to the employee, and frequently arises suddenly and unexpectedly, and he is under no obligation to the railroad company to incur it. Nor is the railroad company under a legal obligation to be ever present with its employee, and to exercise for him that good judgment and common sense in avoiding hazard while performing service, which he assumed to have in accepting employment in a service' which he knew to be accompanied with much danger, and liable to various accidents. The railroad company necessarily sees through the eyes of its employees, and a proper performance of its service and duties is dependent upon their eyes, good sense and judgment. Whether machinery, ways and appliances are sound or defective depends upon the knowledge and skill of its officers and employees, upon whom there must rest an obligation to make known and have remedied such defects when discovered, as well as to inspect them before and during use for the security of themselves as well as those using them; when once placed in the hands and under the control of an employee, it is through his eyes, above all others, that the company must rely for the detection of defects, and from whom information of the same should be obtained.

Nor do I understand that it is within the purview of the statute, either by expression or intendment, to abrogate the doctrine of assumption of risk—*volenti non fit injuria*—from

the nature of the employer corporation, it is compelled to operate through and depend upon its officers and employees; each employee becomes a vice-principal as to the service under his absolute control; and if defects exist in the machinery entrusted to him, or become apparent thereafter, it is his duty to his employer, as well as to himself, to make it known and to use his best offices to have them remedied; his *failure* to give information of such defects leads the employer to assume that none exist, to the great hazard of its property and service. But should he continue in the use of such, knowing the defects, and failing to give the employer an opportunity of making the remedy, then he does so knowingly and willingly, and must be considered to have undertaken to run the risks incident thereto.

Defendant company exhibited to the Court, as a part of the case on appeal, a photograph of the engine and tender upon which the accident occurred. It appears therefrom, as explained by the evidence recited in the record (the tender when backing being in front, I shall speak of the rear end of the tender as the "front"), that there was a platform upon the "front" of the tender, six inches wide, extending the width of the tender across the railroad track, and being about a foot or sixteen inches from the ground or sills upon the track. This was a safe place for plaintiff, and was provided with a hand-hold; but it was not a comfortable place to stay and signal the engineer, as he would have to stoop over to see him, or by peeping around the corner. Above this platform, or step, was a tool-box, and, with the lid shut down, was about two feet wide, and was a safe place to stand, and perfectly convenient in signalling the engineer. The way provided for getting up on this tool-box was a step on the *side* of the tender, about two feet four inches from the ground; there was no grab-iron there on the tender, and it was on that corner of the tender where the drain-pipe extended out.

The drain-pipe was not used for, and was known to be unfit to be used as, a grab-iron; but plaintiff *had* used the one on the opposite side three hundred times, and this one not so often—two or three times—and had never examined it to see if it was sound or securely fastened, but, if it were, it would hold 1,000 pounds.

Plaintiff, when injured, was not getting upon the tool-box from the *side* of the tender, where the grab-iron should have been for that purpose, but was getting up from the platform (provided for his use, and in "front" of the tender) upon the tool-box, and in doing so used for his support the drain-pipe, which broke out, and he fell backwards upon the track in "front" of the moving tender, and was injured before he could get outside of the rails by one of the wheels running over his arm and otherwise doing him harm. Plaintiff was the yard conductor, having under his control the engineer and another employee. He was experienced in the railroad service, and for over two years had occupied the same position, and well knew the safe and unsafe methods of performing his service.

Now, then, with this understanding of the statute, and the burden of plaintiff's case resting upon the fact that there was no grab-iron on the *side* of the tender, and that his injury resulted from the *lack* of such at *that* place, I shall briefly consider what I take to be the *main* question presented in this case:

-Was defendant company negligent in not putting a grab-iron on the side of the tender before delivering the engine and tender to plaintiff for his use in its service?

Plaintiff says his injuries resulted from the breaking of a defective drain-pipe (used as a substitute for the grab-iron) while he was undertaking to mount upon the tool-box. He was not mounting from the *side* of the tender where the grab-iron was necessary for that purpose, for had he chosen that

mode, which was the proper one, and used the drain-pipe and fallen, his fall would have been *outside* of the track, and the wheels could not have injured him.    But he was mounting from the platform (or step) in "front," with his back to the middle of the track, and undertaking to get upon the tool-box from *that* direction, and in doing so used the drain-pipe for his support, which broke out and he fell in "front" in the middle of the track, and was injured by the moving train before he could get out of the track.    Had he undertaken to mount from the *side* of the tender, this injury could not have occurred; but having undertaken to mount from the "front," from which position no appliances were *required* to be fixed for mounting, and in a way not contemplated or suggested by the structure of the machine or the provisions made, his injuries did not result from the neglect of the defendant in failing to put grab-irons on the engine, and I think his Honor erred in not instructing the jury as prayed by defendant, "that upon the whole evidence, taken in the light most favorable to the plaintiff, there is no sufficient evidence to go to the jury of any defective appliance, so far as the want of a grab-iron is concerned, except that of which the plaintiff accepted the risk of continuing in the service of the defendant after full knowledge of such defect," to which defendant excepted and assigned as error.

When this case was last before the Court (128 N. C., 534), I simply entered my dissent, because the opinion of the Court was filed so late that I did not have time thereafter to complete my opinion, which I was preparing, and was unwilling to delay the case on that account.    And now, again, I find myself, in the press of other business before the Court, similarly situated.

MONTGOMERY, J., dissenting.    I can not concur in the opinion of the Court.    It can serve no useful purpose for me to write anything further in the matter, and I content my-

self with the dissent entered by me in the case on its first trial
and reported in 128 N. C., 534.