SMITH v. WILMINGTON AND WELDON RAILROAD COMPANY.

(Filed May 13, 1902.)

1. DAMAGES—*Negligence—Carriers —Railroads —Passengers—Evidence.*

   In an action against a railroad company for putting off a passenger beyond her destination, there being no evidence of any actual damages, or bodily harm, a judgment of nonsuit was properly entered.

2. DAMAGES—*Mental    Anguish—Passengers—Personal    Injuries—Evidence.*

   In an action against a railroad company for damages for carrying a passenger beyond her destination, evidence of mental anguish is incompetent.

   CLARK and DOUGLAS, J.J., dissenting.

ACTION by D. H. Smith and wife against the Wilmington and Weldon Railroad Company, heard by Judge *Thos. A. McNeill,* at September Term, 1901, of the Superior Court of ROBESON County.   From a judgment for the defendant, the plaintiffs appealed.

*Patterson & McCormick,* for the plaintiffs.
*McLean & McLean,* for the defendant.

MONTGOMERY, J.   At the close of the plaintiffs' evidence, the defendant's motion for judgment as of nonsuit was allowed, and the plaintiff appealed.

The gravamen of the action, indeed the only cause of action set out in the plaintiffs' complaint, was the alleged reckless, careless and negligent conduct on the part of the defendant's conductor in carrying her past and beyond the point to which she had bought her ticket, and putting her off in the rain and in an unsuitable place.   The exact language of the complaint in respect to the alleged negligence is as follows:

"That the conductor on said train recklessly, carelessly, negligently and unlawfully, and in absolute disregard of his duties to her, carried said plaintiff past and beyond her destination about three-fourths of a mile, and despite remonstrance on her part, stopped the train and put off said plaintiff and her children in a low, wet and swampy place, and in the midst of a steady rain and at a considerable distance from any shelter or other protection from said rain, and where it was neither likely nor probable that any one would meet said plaintiff and her children; all of which was done to the serious inconvenience, annoyance, damage and injury to said plaintiff and children to the amount of ten thousand dollars."

There was no evidence that she suffered any bodily harm, or that she was put to any expense in reaching her home from the point at which the conductor helped her to alight. It is true that she said she got wet and was laid up for several days, and was exhausted and very much fatigued; but her physician, who prescribed for her that very morning, testified that for sometime she had been suffering from nervous prostration and functional disorder of the heart, and that her condition was such that she would have been sick anyway. Just immediately before the occurrence, a summer thunderstorm was approaching, and all of her evidence showed that she would have become wet from the rain if she had stopped at the point where the conductor had agreed to stop the cars for her to get off. And besides, there was no house or building at the agreed point of her destination, and no one awaiting her upon her arrival. In fact, the plaintiff not only did not claim in her complaint, as we have seen, any damages other than such as were alleged to have arisen by reason of the conductor having put her off at the place and in the manner he did, but in her testimony also, in answer to a question on her cross-examination, she said: "I sued for damages for being put off out there where there was no one to meet me

and away from any house or protection of any kind, and in the rain." It is significant, too, in this connection, that although she testified that she had consulted counsel with reference to bringing suit in this matter, the summons was not issued until the March following the time of the occurrence—4th of July, 1899. She testified herself also: "I was not put to any additional financial expense by reason of being put off at Cameron instead of at Stewarts." In the course of the trial the plaintiff undertook to show that she suffered mental suffering, and she was asked this question by her counsel: "State whether or not there was any mental suffering by reason of the treatment of the defendant?" And his Honor very properly, in our opinion, refused to allow the question. We do not intend to extend to that extent the doctrine of mental anguish. So far as we now recall, that doctrine has only been allowed in this Court in cases where there has been personal injury, except in cases where telegraph companies have been negligent in their failure to send and deliver messages concerning personal or domestic affairs, such as the illness or death or something equally as serious, between persons who are near of kin.

Neither do we think that there was any evidence tending to prove that the defendant's conductor, in his conduct, did or said anything which would justify the plaintiff's attempt to recover as for punitive or exemplary damages. Dr. McKenzie, a witness for the plaintiff, testified that the conductor was considered "a very gentlemanly conductor." On the present occasion he told the plaintiff that he was unable to stop the train, a long freight train with one passenger coach in the rear, at the point he had agreed to stop for her benefit; that he was unable to communicate with the engineer the signal to stop. He gathered together her parcels or bundles, and, in her own language, "helped me and the children off the train by lending his hand to us, and when we got to the

end of the car Captain Lockamay went out ahead of us." She also said that the conductor stood at the end of the car on the ground and remained there during the entire time the train was at Cameron, and that he was talking with her some of the time. It was also in evidence that very near the point where the cars were stopped were residences and homes, and in one of them (Mr. Cameron's) the plaintiff and her children found shelter and protection.

So it appears from the evidence that while the conductor may not have measured up to the standard recognized by the plaintiff in point of politeness, he yet in law fulfilled every duty imposed upon him as conductor of the defendant's train in the acts of helping her to alight from the car and in attending upon her after she alighted and before the train moved off.

If it were admitted that the plaintiff was wrongfully put off the train, she would be entitled to recover only the actual damages that she would have sustained therefrom, and if the act was accompanied with unnecessary force or other circumstances calculated to humiliate her, or to wound her pride, or with a reckless indifference to consequences, insult or rudeness, showing malice, such damages might have been allowed by the jury as they should think were warranted by the facts, in the way of punitive damages. *Rose v. Railroad,* 106 N. C., 168; *Hansley v. Railroad,* 117 N. C., 565, 32 L. R. A., 543, 53 Am. St. Rep., 600. The evidence discloses no such conduct on the part of the conductor. It is true that the plaintiff said that "the conductor treated me in a rough, indifferent manner, was mad and spoke in a harsh tone," but that evidence, when taken together with what the conductor actually did under all the surroundings, makes it perfectly clear to us that what she complained of was a matter of taste and not of substance. In the confusion of the storm, the downpour of rain, the fright of the children probably and her

own weak and nervous condition, combined to cause her to take an extreme view of the situation and to do the conductor an injustice in her censure of him.

No Error.

DOUGLAS, J., dissenting.   I must again dissent from the opinion of the Court.   That this Court can say as a matter of law that a common carrier is not guilty of negligence when it sells tickets to a woman, contracting to carry her to Stuart's Siding, and then carries her beyond her destination, and over her protest puts her and her four little children out in the rain, can never receive my assent.   Let us examine a part of the evidence:  "Dr. J. C. McKenzie, witness for plaintiff: I live in South Carolina.   I saw the plaintiff on the 4th of July, 1899, at Tatum, S. C., on the railroad to Stuart.   I purchased one and one-half ticket for them.   I saw them take passage on the train.   There were four children.   I do not know their ages, but think the youngest one is about nine months old."   Cross-examination: "I bought the tickets on the Yadkin Valley Railroad.   I did not see the conductor on that day.   It was a freight train."

"Re-direct: The train had a passenger car attached, and carried passengers."

"Mrs. M. J. Smith, plaintiff: I was at Tatum station on the 4th of July, 1899.   I left there on the northbound freight train.   I do not know who was the conductor.   I had one ticket and one one-half ticket.   I had my four children with me, one nine months old, one two years old, one four years old, and the other ten years old.   I gave the tickets to the conductor.   Dr. McKenzie saw me get on the train; he also helped me on the train.   I was to get off at Stewart's Siding, and when the conductor passed through the car, I called it to his attention, and asked him if he was going to stop at Stewart's Siding; and I told him I was to get off there and not at Cam-

eron's saw-mill; and he said all right, he would have the train stopped. I did not see him any more until I got out in the bay where he put me off near Cameron. He came to me and began to pick up my bundles and said, 'Here is the place where you will have to get off.' I told him at John Station that I would have to have help. He came and picked up my bundles and I followed after him. There was a fearful look-ing cloud, and it was raining, thundering and lightning. The place he put me off at was down in a pond in a low, wet place, with railroad ditches on each side. I stayed there for five or ten minutes. There was no shelter, and it was raining. The conductor stood out on the ground until the train left. This was between one-half and three-quarters of a mile from the station to which I bought my ticket. The conductor treated me in a rough, indifferent manner, and was mad and spoke in a harsh tone. It was after I passed Stewart's that I was put off. It was in a low, wet, rough place, and I could not go on until the train left. When he put me off, I crossed on the other side where there were no bushes and stood there until the train left. The train was in the way, and as I had my children, I could not go along until the train left. When the train left, I started up the road towards the postoffice. I went to Phil. Cameron's house after it slacked raining. Miss Pearlee Jernigan was at Mr. Cameron's, and she brought an umbrella and came to meet me. She took my baby and car-ried it to the house. When it slacked raining, I sent one of my children over home to tell them I was there without any way to get home, and to come after me. I was wet, and re-mained in that condition for about two hours."

State what was the condition of these children at the time you reached Mr. Cameron's house? "They were as wet as I was, and had to stay wet as long as I did."

State, Mrs. Smith, whether or not you experienced any suffering on this occasion by reason of the conduct of the de-

fendant, and if so, what? "It laid me up for several days, and I was exhausted and very much fatigued. I was sick any way that morning, and had been under the treatment of Dr. McKenzie for several years."

She again says, on cross-examination: "I would have gotten wet very little had I gotten off at Stewart's, because there was a shelter and my conveyance would have been there to meet me. There was no conveyance there when I passed Stewart's, but one would have been there in a few minutes."

There is much other testimony, some of which is conflicting, but that does not justify taking the case from the jury. We must remember that this is a compulsory nonsuit, which is equivalent to a demurrer to the evidence. The evidence of the plaintiff is therefore admitted to be true, and must be construed in the light most favorable to her. This has been held in a long and uninterrupted line of decisions. *Cox v. Railroad,* 123 N. C., 604; *Cogdell v. Railroad,* 124 N. C., 302; *Moore v. St. Ry. Co.,* 128 N. C., 455; *Coley v. Railroad,* 129 N. C., 407, and cases therein cited.

In *Springs v. Schenck,* 99 N. C., 551, 555, 6 Am. St. Rep., 552, MERRIMON, J., speaking for the Court, says: "As the Court in effect intimated upon the trial that in no reasonable view of the evidence could the appellant recover, it must, for the present purpose, be accepted as true and taken in the most favorable light for him, because the jury might have taken that view of it, if it had been submitted to them."

In *Purnell v. Railroad,* 122 N. C., 832, FURCHES, J., speaking for the Court, says: "This motion is substantially a demurrer to the plaintiff's evidence, and this being so, and the Court having no right to pass upon the weight of evidence, every fact that plaintiff's evidence proved or *tended* to prove must be taken by the Court to be proved. It must be taken in the strongest light, as against the defendant."

If this remains the law, I see no principle of law upon

which this case can be taken from the jury.  Giving to the plaintiff's testimony its proper weight, it is evident that the defendant broke its contract of carriage, and further injured the plaintiff by putting her off in the rain at an unsuitable place.  Merely carrying the plaintiff beyond her destination was actionable negligence for which she was entitled to at least nominal damages, giving her costs both in this Court and the Court below.

In *Cable v. Railroad,* 122 N. C., 892, 899, it is said by a *unanimous* Court: "There is another point in the case at bar on which the plaintiff was clearly entitled to go to the jury. He testified without contradiction that he was on the train as a passenger, had paid his fare to Benaja, a regular station of the defendant company, and was carried beyond his destination by the failure of the conductor to stop his train.  This of itself was negligence on the part of the defendant, and entitled the plaintiff to at least nominal damages.  This is a well-settled rule of law, even in the absence of a local statute. Fetter Carriers of Passengers, Sec. 66, 300, and cases therein cited; Schouler Bailments and Car., Sec. 661; Thompson Car. of Pass., page 581; Hutchison on Car., Secs. 612, 614; 5 Am. and Eng. Enc. Law., pages 565, 566. 572, and notes thereunder.  In this State, the liability is directly imposed by statute.  The Code, Sec. 1963, provides that "Every railroad corporation shall start and run their cars for the transportation of passengers and property at regular times, to be fixed by public notice, and shall furnish sufficient accommodation for the transportation of all such passengers and property as shall within a reasonable time previous thereto be offered for transportation at the place of starting, and the junction of other railroads, and at *usual* stopping places established for receiving and discharging way passengers and freights for that train, and shall take, transport and *discharge* such passengers and property *at,* from and *to* such places on

due payment of the freight or fare legally authorized therefor, and shall be *liable* to the party aggrieved in an action for damages for any neglect or refusal in the premises.' As to the quantum of damages, the rule may be found in *Purcell v. Railroad,* 108 N. C., 414, 12 L. R. A., 113; and in *Hensley v. Railroad,* 117 N. C., 565, 32 L. R. A., 543, 53 Am. St. Rep., 600."

I am not aware of any change in the statute, and it would seem that, if it was the law then, as was said by a unanimous Court, it would be the law now. So she was entitled to at least nominal damages in the Court below, and to a new trial for refusing to allow them. I think she was entitled to substantial damages.

Returning to the evidence, there are some things in the opinion of the Court that I can not understand. It says: "There was no evidence that she suffered any bodily harm." She says she did, and the truth of her evidence is admitted by the demurrer. Being asked the distinct question whether she experienced any suffering on this occasion *by reason of the conduct of the defendant,* she answers as follows: "It laid me up for several days, and I was exhausted and very much fatigued."

The opinion also says, after referring to this testimony, "But her physician, who prescribed for her that very morning, testified that for some time she had been suffering from nervous prostration and functional disorder of the heart, and that her condition was such that she would have been sick anyway." Even if we were permitted to compare and weigh the evidence, and draw our own deduction from conflicting inferences, it seems to me quite a natural inference that a woman already suffering from such dangerous diseases would be made worse by being rudely put out in the rain with a nine-months child in her arms. To my mind her sick and helpless condition should have been an additional protection to her instead

of a mere shield to protect the defendant from the consequences of its own wrong.

There are in the opinion other inferences of fact which seem equally unsustained by the testimony and unwarranted by law. In my opinion, there should be a new trial.

CLARK, J., concurs in the dissenting opinion.