SARAH E. DERMID, Administratrix, v. SOUTHERN RAILWAY
COMPANY et al.

(Filed 30 May, 1908.)

**1. Railroads—Contributory Negligence—Coupling Cars—Nonsuit.**

When as a necessary consequence in coupling together freight cars onto a train the engine must back upon them to take up slack, it is contributory negligence on the part of the conductor to signal the engine for this purpose and then go at once between the cars to couple together the air-brake hose beneath them, when from his experience he knew of the danger of doing so; and upon such evidence by plaintiff a motion of nonsuit should be granted.

**2. Same—Safe Methods.**

When there is a safe and usual way and an unsafe way to couple cars to a freight train, and a conductor of long experience, having knowledge of the usually safe way, assumes to act therein for the brakeman, whose duty it was, but in the manner known by him to be dangerous, his thus acting will bar a recovery in a suit for damages for injury thereby caused to him.

**3. Railroads—Negligence—Modern Equipment—Injury from Another Cause.**

When the damages complained of were not caused by failure of a railroad to equip its trains with automatic couplers or the latest and most approved devices, the principles of law enunciated in those instances are not applicable.

**4. Railroads—Negligence—Evidence—Coupling Cars.**

Evidence of negligence is not sufficient which merely shows that, in obedience to a signal from the conductor, the engineer took up the slack in his train of freight cars and thereby injured the conductor, who, immediately after signalling, went between the cars unexpectedly for the purpose of coupling them.

**5. Railroads—Negligence—Evidence—Modern Equipment—"Bumpers"—Questions for Court.**

When a recovery against a railroad company is sought upon the ground that its train was furnished and equipped with automatic 'couplers, but that the bumpers had not been removed therefrom; that plaintiff's intestate was injured while coupling the cars as the engine was taking up slack, the mere fact that the bumpers were permitted to remain on the cars raises no question of negligence for the jury, when it appears from the other testimony that the bumpers were then in general use on cars of that character.

Clark, C. J., dissenting *arguendo;* Hoke, J., concurring in the dissenting opinion.

ACTION tried before *Peebles, J.,* and a jury, at March Term, 1908, of BUNCOMBE.

This action is brought by the plaintiff against the defendants, the Southern Railway Company and Dwight W. Newell, a trainmaster of defendant company, for the negligent killing of Claude C. Dermid, a freight conductor in the employ of said company. The court submitted certain issues involving the negligence of the defendants, the contributory negligence of the plaintiff's intestate, and damage.

At the close of plaintiff's testimony the defendants moved to nonsuit, under the Hinsdale Act, and offered no evidence. Upon an intimation of the court that he would charge the jury that, if they found the facts to be as testified to by the plaintiff's witnesses, they should answer the first issue "No," the plaintiff submitted to a nonsuit and appealed.

*Merrimon & Merrimon* for plaintiff.
*Moore & Rollins* for defendants.

BROWN, J. We will regard the intimation of his Honor as tantamount to sustaining the motion to nonsuit, and, taking all the evidence in the most favorable light for the plaintiff, we are of opinion that she is not entitled to recover:

1. Because her intestate, upon her own showing, was guilty of such contributory negligence as bars recovery.

2. Because there is no sufficient evidence of negligence.

There were only five witnesses examined—the plaintiff herself, Patton, Moody, Bryant and Barkley. The evidence of the first two throws no light whatever upon the two material issues involved. The evidence of all tends to prove these facts: The plaintiff's intestate was killed on the Balsam Mountain section of defendant company's road, on 16 January, 1906, by being crushed between two cars of a freight train of which he was conductor. In order to get his train up Balsam Mountain the conductor had to take it up in sections. When he had gotten it all up to the top it became necessary

to couple up the entire train again. It was fully equipped with automatic couplers and air brakes. The intestate gave an order to the engineer to detach his engine from the cars and to bring up the caboose and attach it to the end of the train. In order to uncouple, it was necessary to back the engine so that the "slack" would be shortened, thereby loosening the coupling pin holding the coupling of the engine and the car to which it was fastened, so that it could be removed, thus detaching the engine. At the time he gave his order the intestate was standing close by the side of the train and immediately opposite the opening between two parts of the train. He went in between the cars at once, upon giving the order, to couple together the air brake hose under the cars and to turn on the air cock underneath the car couplings. When the engine was backed so as to shorten slack and detach the engine, in obedience to the conductor's order, he was caught between the bumpers of the cars and crushed in the chest and killed. The plaintiff's intestate had been for three or four years a brakeman for the defendant company, and after that had served for about two years as freight conductor. He knew all about the operation of freight trains, and that, to obey the order given to the engineer, the latter must "give slack" to permit the coupling pin to be removed, and that the effect of this must be to push the two cars together. Nevertheless, the intestate at once, upon giving the order, walked between the cars and was crushed. The plaintiff's witnesses themselves characterize such conduct as dangerous. The facts show that the intestate must have seen the bumpers and must have known the effect of "giving slack." The witness Moody testifies to hearing the rumbling noise of the cars as they came back together just before the intestate was hurt. All the witnesses testify that it was the air brakeman's duty to couple the air hose, and that there is a safe and usual method of doing it, which should have been followed by the

intestate.   This safe and usual method is testified to very clearly by the witness Moody, a brakeman:

"Question.  I wish you would tell how that operation of the making of the coupling of the air hose, the turning of the air cock, should be done in the safest way, under the rules of the company.   Do you know?

"Answer.  Yes.

"Q.  Tell how.

"A.  If a man wants to couple the air hose and be safe, he wants to get down and reach under the dead blocks.

"Q.  And that is the rule required by the company?

"A.  That is the way I always did it.

"Q.  And were required to do it?

"A.  Yes."

The evidence shows that it was not the conductor's duty to couple air hose, but that of the air brakeman, and it must follow that if he voluntarily undertook to perform that duty he should have done it in the recognized safe method.   He had been a brakeman and conductor of long experience and knew how such work was usually done.   It was his duty to follow the safe method in general use, and not to walk in between cars that his knowledge and experience told him must soon come together.

The intestate not only chose to unnecessarily encounter an obvious danger, but he selected a method of doing the work known to him to be dangerous, when he could have performed the same act with reasonable safety by following the known method usual among brakemen.   That the conduct of the intestate is such negligence as bars recovery for damages sustained in consequence of it is held by the great weight of authority.   *Whitson v. Wrenn,* 134 N. C., 86, and cases cited; *Elmore v. Railway,* 132 N. C., 867.

The principle of law applicable here is well stated in *Covington v. Furniture Co.,* 138 N. C., 378, "that where there is a safe and a dangerous method available for the performance

of the work in hand, and the servant selects the latter with actual knowledge of the fact that it is dangerous, he cannot recover." To same effect is *Horne v. Power Co.,* 141 N. C., 50.

The intestate was not killed because the cars were not equipped with automatic couplers or the latest and most approved devices, and therefore there can be no application of the principle enunciated in the *Troxler* and *Greenlee cases.*

We also agree with his Honor that there is no evidence of negligence upon the part of the defendant company, much less upon the part of defendant Newell, the trainmaster.

The engineer was not negligent. He only obeyed the command of the conductor. He was not required to anticipate that the conductor would go outside of his duty and walk into a place of great danger at the very moment the engineer was proceeding to execute his order.

There is no evidence that the cars or any part of them were out of repair in any respect which caused the injury, or that the company's trainmen were either incompetent or insufficient.

The evidence is wholly insufficient to warrant a finding of negligence because the cars had bumpers on them. It is not a question for the jurors as to whether bumpers are useless and should be removed. They are not experts in car construction or railroading. The evidence tends to prove that at the time the intestate was killed bumpers were in general use, especially on all old cars and on railroads generally. There is evidence also that many new cars are constructed with bumpers, but of a new and different pattern and construction.

Why cars should have bumpers on them, and their use and purpose, are not disclosed, but, as is said by Moody, one of plaintiff's witnesses, "I suppose bumpers were considered of use or they would not have been left on." The same witness testified that they are in general use and continue in general use after the adoption of the automatic coupler.

The witness Bryant testified that from 25 to 50 per cent. of freight cars have bumpers on them, that they are visible to a person going between the cars, and that he could not say that in January, 1906, he ever saw a car with bumpers removed.

The witness Barkley, a car inspector, testified:

"Q. To what extent, if you know, have these dead bumpers been in use since the automatic couplers were used?

"A. Not so much. The majority of cars that are being built now are built without them."

Taking the entire evidence offered into review, we think it fails to disclose anything that tends to prove the failure to discharge any duty which either defendant owed to the plaintiff's intestate.

The view we take of the case renders it unnecessary to consider the other exceptions in the record.

Affirmed.

CLARK, C. J., dissenting. The plaintiff's intestate was killed by being crushed by the dead bumpers between two cars while coupling the hose of the air brakes in making up a train of ten cars which had been divided up into sections of three or four cars each and thus carried piecemeal up the Balsam grade and then recombined into a train. The conductor sent word to the engineer to detach his engine and go back and get the caboose, and went in to couple the air hose. The engineer, without warning, backed his engine against these cars to loosen the "slack" so the engine could be detached. The brakes had not been put on by the brakeman, as he should have done, and the impulse given by the engine rolled down the line of cars, so that when the conductor raised up from coupling the hose he was caught between the dead bumpers and killed. The complaint alleges negligence, in that the defendants failed and omitted to discharge their duties, in that they failed and omitted:

1. To provide a safe place to work in, having reference to the deceased's employment as conductor of a freight train.

2. To provide safe appliances and machinery for the accomplishing of the work the deceased was required to do in the operation of his train.

3. To furnish a sufficient number of reasonably safe and competent men or servants to perform their respective duties in the operation of said train.

4. To see that the rules for the conduct of said men and servants were complied with.

The answer of the defendants admits the alleged duties, and only denies that the defendants were guilty of negligence, as alleged.

In the third paragraph the plaintiff alleges her concrete case substantially as follows:

"That in January, 1906, the plaintiff's intestate and the crew were directed by defendants to take charge of a freight train, consisting of engine and tender and five loaded cars and eleven empty freight cars and a caboose, at the city of Asheville, and go west on the road with said train to Addic and distribute said cars at divers stations, and to get together certain loaded freight cars at said last-named station and stations east of it, and form a freight train of the same and bring it to Asheville the same day; that between Addic station and Balsam station, east of it, the said intestate found ten loaded freight cars which he was to take to the city of Asheville; that the grade between the said stations of Addic and Balsam was very steep and heavy and difficult of ascent, and it was necessary to make three trips up said grade to Balsam; that three of said cars were taken up at each of said first trips and placed on a siding, and at the third trip the remaining four cars were taken up and made secure on the main track of the road by the use of brakes; that the engineer then detached his engine from the four cars, went in upon the siding and brought out the six cars on the main track and pushed them back until

they were coupled to the four cars, and then drew out the slack, leaving at the place of the said coupling a wide space between the bumpers of the said two cars, *the said bumpers being unsafe and unfit to be used on the cars, and of a kind and fashion which had been generally discarded as dangerous and unfit;* that as soon as the said coupling was effected and the slack drawn out, the plaintiff's intestate, as it was necessary for him to do, and there being no one else to perform the service, went between the said two cars and bumpers at the point of coupling and turned the angle cock in order to connect the air hose, and while thus engaged the engineer carelessly and negligently and suddenly and *without any warning* to plaintiff's intestate, by the use of the engine, caused the cars in front of the point of coupling to slack back, by means whereof the intestate was caught between the said cars and bumpers and was killed." The complaint further alleges in the said third paragraph: "That, after the cars were coupled and the slack drawn out, the brakeman carelessly and negligently failed and omitted to apply the brakes to the said six cars or any of them in front of the point of coupling to the said four cars, so as to prevent the slacking back and killing of the intestate; that the flagman was not on the train at the time and did nothing to warn plaintiff of the danger; that the negligence of the defendants alleged in this and in the second paragraph of the complaint was the proximate cause of the intestate's death."

The answer admits substantially all the allegations of the third paragraph of the complaint, except the charges of negligence, and sets up the plea of contributory negligence, as follows: "That the plaintiff's intestate contributed, by his own recklessness, carelessness and negligence, to the injuries resulting in his death, in going between the said two cars to turn the angle cock for the purpose of cutting in the air; that it was not his duty to couple and cut in the air, and in attempt-

ing to do so he was acting in direct violation of the known rules and instructions of the company."

At the close of the plaintiff's evidence in chief, the defendants moved for a nonsuit. Upon this motion the court, for some reason unexplained by the argument, denied the motion, but at the same time substantially granted it by announcing that he would charge the jury to answer the first issue in the negative. The plaintiff, upon this intimation, took a nonsuit and appealed.

In the process of the trial the plaintiff took exception to several of his Honor's rulings on questions of evidence, which are unnoticed entirely in the opinion, but which are meritorious.

The plaintiff regarding it as material to show that the dead bumpers which killed the deceased were useless, an obstruction and a dangerous menace, and that if they had been off and out of the way there would have been no danger whatever to the deceased at the time he was killed, her counsel asked the witness: "Suppose that they had been off, what would have been the width of the space between the cars where Dermid was between them when the slack was not drawn out?" Objection was made to this question, and the court sustained it. According to all the evidence it was necessary that whoever coupled the air brakes should go between the cars. It was, then, competent to show that if the bumpers were off the deceased would not have been caught and crushed.

The witness was also asked: "What was the use of the dead bumpers after the automatic couplers were adopted?" This was to show that they were useless, as the other question was to show that they were dangerous and therefore a "defective appliance." It would certainly seem that the plaintiff was entitled to show these facts, and that it was error to exclude these questions.

The witness was an employee on that train when the plain-

DERMID *v.* RAILROAD.

tiff's intestate was killed, and saw it all.    He was asked: "In reference to the space between the two cars, situated like these where Dermid was killed, suppose there were no bumpers on those cars at all, what would have been the effect of the engine slacking back upon Dermid inside there?"    The object was to show that he would not have been hurt, for with automatic couplers, if there were no dead bumpers, there was space enough for safety.    The exclusion of this testimony was erroneous.    The witness was asked as to a fact in his own knowledge, not an inference.

The witness was asked: "What space would remain between those cars if they had been slacked back without those bumpers on at the time Dermid was killed?"    Also, "If those bumpers had not been there, state whether Dermid would have been able to turn those angle cocks and couple the air hose without being crushed between the cars."    Both questions were excluded.    These questions were asked of a witness who saw the killing of Dermid and knew how it was done.    The evidence was competent as tending to prove the allegation that the "bumpers were unsafe and unfit."    It was error to refuse to permit the plaintiff to develop her case and prove her allegations.    They had not been demurred to. Besides, the allegations were proper and pertinent.

Another witness, Barkley, had testified that he was in the service of the defendant company from the time it took charge of the road, in 1893, down to the latter part of 1896, and then in the latter part of 1901, for a year, as car inspector; that he is familiar with freight cars and their equipment; that, since automatic couplers were used, dead bumpers were not used so much, and that the majority of cars being built now are without them.    The witness was then asked, and the question was ruled out: "Is there any difficulty in taking off these bumpers?"    It is difficult to see what possible objection there could be to an answer to this question.    The answer to it might have been very material, and would have been so

especially if the witness had answered, as he certainly must, that they could have been taken off in a very short time and without trouble or any considerable expense, and that they were of no use whatever since the adoption of automatic couplers. Besides, it is a matter of common knowledge. Any one who looks at a dead bumper can see that there is no difficulty in taking it off.

The last exception presents the single question, Was there any evidence proper to be submitted to the jury tending to prove the affirmative of the first issue, viz., "Was the death of Claude C. Dermid, the intestate of the plaintiff, caused by the negligence of the defendants, as alleged?"

Since *Russell v. Railroad,* 118 N. C., 1098, negligence has been regarded as a question of fact. *Ruffin v. Railroad,* 142 N. C., 120.

In this action the plaintiff alleges various omissions of duty on the part of the defendants constituting negligence, and, if the evidence offered by her tends to establish any one of said negligent omissions as the proximate cause of her intestate's death, the court erred in not submitting this evidence to the jury on the first issue. "Direct evidence of negligence is not required, but the same may be inferred from acts and attendant circumstances, and if the facts proved establish the more reasonable probability that the defendant has been guilty of actionable negligence the case cannot be withdrawn from the jury, though the possibility of accident may arise on the evidence." *Fitzgerald v. Railroad,* 141 N. C., 530, cited in *Bird v. Leather Co.,* 143 N. C., 287.

The plaintiff is entitled to have the court look into her case in the most favorable light to her. As was said in *Millhiser v. Leatherwood,* 140 N. C., top of page 235: "All the facts that make for the plaintiffs must be taken as established, and considered by us, and all those that make against them must be rejected. In a few words, they are entitled in this Court to the most favorable interpretation of the evidence, after ex-

cluding all that is against them.   *   *   *   The right of the
plaintiff to have the case submitted to the jury cannot be de-
nied or abridged, providing there is some evidence tending to
establish the plaintiff's contention.   The same principle ap-
plies with equal force when a plaintiff, in deference to an
adverse intimation of the court, submits to a nonsuit."

The evidence tends to show that, under the circumstances
and facts as they are admitted by the defendants in their
answer, the crew of the freight train in question was not suffi-
cient in number and that the brakeman, Moody, was incom-
petent or reckless.   The witness Bryant had been a freight
conductor and a brakeman and knew and understood all about
the workings of freight trains, and he testified that it was the
duty of the brakeman, Moody, to have charge of the six cars
and to use all caution in bringing them out safely from the
siding, and that at that particular point he should have put
at least one or two brakes upon the rear of the six cars at-
tached to the engine.   The witness did not think it would
have been necessary to couple the air, as this brakeman was
on top and could have fastened the hand brakes, and he should
have fastened at least two hand brakes on the rear cars, mean-
ing by rear cars those which were to come in contact with the
four cars that had been left on the main track.   The witness
further said that if the brakes had been applied to the said
two rear cars the engine could have been detached without
slacking back, and it would seem beyond controversy that the
negligent omission of Moody to put on the brakes was the
proximate or one of the proximate causes of the death of the
deceased.   Again, it is alleged that the dead bumpers between
the two cars where the deceased met his death were defective.
The witness Moody testified that these dead bumpers, when
the slack was drawn out, stood from twelve to fourteen inches
apart.   The witness Bryant said that if these bumpers stood
so far apart "it would show a defect somewhere in the draw
gear—the gearing fastening the drawhead—and allow one of

the other drawheads to go out too far." The witness Barkley said, upon this point, that if the bumpers were twelve or fourteen inches apart when the slack was drawn out, either they or the draw gear were not in the proper condition. He said their width was about four inches, unless there was a slack in the draw gear from the button or rill pin. This witness was an experienced car inspector.

All the evidence shows that it was common for the freight conductors to go in between the cars and couple the air hose; that this coupling could not be made except by going in between the cars; that it was made under these bumpers. It is almost certain that the deceased stooped and made the coupling, and as he raised himself he came up between these two dead bumpers at the very instant that the cars in front of him were allowed to roll back and catch him. If these dead bumpers had been only four inches apart he could not have been caught between them. He was a large man. And, again, if the bumpers had not been on, there would have been ample room between the cars for the deceased to stand without being injured. Besides, the deceased had a right to rely upon Moody, the brakeman, to do his duty. Moody in this respect represented the company. *Fitzgerald v. Railroad,* 141 N. C., 534. In that case it is held that the "Fellow Servant Act," where it applies, "has the effect of making all employees of the railroad companies agents and vice-principals of the company, so far as fixing the company with responsibility for their negligence is concerned, \* \* \* and it operates on all employees of the company, whether in superior, equal or subordinate positions."

The evidence in this case tends to show gross negligence on the part of the brakeman. According to his own testimony, when he went to bring out the six cars from a siding he took off the brakes. The air hose was not coupled, and when he got on the main track, although the six loaded cars had to be moved down grade to be coupled, he did not apply the hand

brakes to any car of the six, but quietly descended from the cars and did nothing. He certainly did not give the deceased warning in any way that he was neglecting his duty.

Now, as to the defendant Newell, the trainmaster. He was charged with the duty of furnishing to the deceased a safe place to work. It was his duty to see that he did not give deceased freight cars with defective dead bumpers, and that he did not give him negligent or incompetent brakemen, and that he did give a sufficient number of men to manage the train in a safe manner. The conductor was forced to couple the air hose, though not a conductor's duty, because the only other employees were the engineer, fireman and brakeman, who were otherwise employed. It also seems, from the testimony of Moody, that the deceased had no rules or instructions, from Newell or any one else, to go by, but acted upon his own initiative and made his own rules. There is also sufficient evidence tending to show that the engineer was negligent in slacking back the train, as he did, without warning any one. Indeed, there is not any negligence charged in the complaint that is without evidence to support it, and the evidence was such as ought to have been submitted to the jury. The company and its trainmaster, Newell, were both guilty of continuing negligence, as the same has been defined in the leading cases of *Greenlee v. Railroad,* 122 N. C., 977; *Troxler v. Railroad,* 124 N. C., 191; *Elmore v. Railroad,* 130 N. C., 506, and 132 N. C., 865; *Fleming v. Railroad,* 131 N. C., 481; *Hairston v. Leather Co.,* 143 N. C., 512.

Dead bumpers were always dangerous, but with the old link and pin they were necessary to keep the cars from smashing into one another. After the adoption of automatic couplers dead bumpers were *unnecessary and dangerous;* hence their retention is a defective appliance and a continuing negligence. They are dangerous, because a witness on this trial testified to it, and on this motion his evidence must be taken as true. Besides, the killing of plaintiff's intestate also

148—13

proves it.   They are unnecessary, because the witnesses testified that all the new cars built by the defendant since automatic couplers were adopted were without dead bumpers, and that they had been removed from all its old cars whenever "shopped," *i. e.,* sent to the shops for any purpose.   The witnesses refused pointedly to testify that these dead bumpers were "in general use" at the time of Dermid's being killed by them, and even to say that they were then "extensively used." All that they would say was that they were "used some."   One witness thought that 25 per cent. of the old cars of the "Southern" still had these bumpers; another said it might be 40 to 50 per cent. of their old cars had them.   It may be added here that, by actual count, in the last few days only 2 per cent. of the freight cars coming into Raleigh on all the railroads still had "dead bumpers."

In 1892 (fifteen years ago), in *Mason v. Railroad,* 111 N. C., 482, the Court intimated that the absence of automatic couplers might be held negligence, and did so hold in *Greenlee v. Railroad,* 122 N. C., 977, as to an accident which occurred in 1896.   Congress in 1893 passed the act requiring automatic couplers to be put on all freight as well as passenger cars by 1 January, 1898.   The danger of being caught and crushed by the dead bumpers was the chief danger removed by the adoption of automatic couplers, for until that was done they were necessary.   After that they were unnecessary, as is fully shown by the evidence that none of the defendant's cars built since the adoption of automatic couplers have these dead bumpers, and that they have been removed from the old cars at its convenience, *i. e.,* whenever "shopped."   As the absence of automatic couplers in 1896 was declared negligence, certainly the retention of the dangerous bumpers at the time of this accident, in 1906, ten years after they had become unnecessary, was negligence *per se,* or at least evidence of negligence which should have taken the case to the jury.

It is quite certain that his Honor's ruling was based, not so much upon the want of evidence of the defendant's negligence, but upon what he regarded as the negligence of the deceased in going between the cars. Presumably the plaintiff's intestate exercised due care for his own safety. *Cogdell v. Railroad,* 132 N. C., 852, cited in *Stewart v. Railroad,* 141 N. C., near top of page 277.

This presumption is founded on a law of nature, the instinct of self-preservation. *Railroad v. Landrigan,* 191 U. S., top of page 474; *Railroad v. Gentry,* 163 U. S., 366, and cases there cited.

There is never any presumption of contributory negligence. *Norton v. Railroad,* 122 N. C., foot of page 928. But the Judge, indeed, had nothing to do with the question of contributory negligence. The act of the deceased in going between the cars stands upon the same footing as the act of the engineer who caught a grab-iron to get on an engine; whether it was negligence to do so or not was a question for the jury. *Coley v. Railroad,* 128 N. C., 534; *Walker v. Railroad,* 135 N. C., 741.

As was said in *Railroad v. McDonald,* 152 U. S., foot of page 281, "Even in the case of an employee of a railroad company claiming to have been injured as a result of the company's negligence, this Court has said that, in determining whether he has recklessly exposed himself to peril or failed to exercise the care for his personal safety that might be reasonably expected, regard must always be had for the exigencies of his position—indeed, to all the circumstances of that particular occasion." See, also, *Kane v. Railroad,* 128 U. S., 91, where it is held that "This question ought not to be withheld from the jury unless the evidence, after giving the plaintiff the benefit of every inference to be fairly drawn from it, so conclusively establishes contributory negligence that the court would be compelled, in the exercise of a sound judicial discretion, to set aside any verdict returned in his favor."

See, also, *Railroad v. Cox,* 145 U. S., at page 606. The defendant company was bound to take notice of the unfitness of the dead bumpers on those cars. *Warner v. Railroad,* 94 N. C., 250.

The dead bumpers, by the evidence in this case, were dangerous and unnecessary, hence a defective appliance; and by the "Fellow Servant Act" the plaintiff's intestate assumed no risk therefrom. Revisal, sec. 2646; *Coley v. Railroad,* 128 N. C., 534; *same case,* 129 N. C., 407.

The contributory negligence pleaded was not that the deceased failed to act prudently after going between the cars, but only that his death was caused "by his own recklessness, carelessness and negligence in going between the cars to turn the angle cock for the purpose of cutting in the air, which was not his duty, and in doing what he did he was acting in direct violation of the known rules and instructions of the company." Now, clearly, there was no negligence in going between the cars. The air hose had to be coupled, and this could not be done without going between the cars, and the conductor was responsible for his train and the proper management of it and was in the habit of connecting the air hose. There is not a syllable of evidence to show that he was acting in violation of any rule or of any instructions of the company or any one else. It is not contributory negligence to undertake a dangerous work. *Thomas v. Railroad,* 129 N. C., 392; *Cogdell v. Railroad,* 129 N. C., 400.

The deceased was ordered to go and bring in the loaded cars, and it was the duty of the company to see that those cars were safe in all respects. *Railroad v. Tynon,* 56 C. C. A., 192; 119 Fed., 288.

The deceased was entitled to assume that his employer had used due care to provide reasonably safe appliances for doing his work (*Railroad v. Swearingen,* 196 U. S., 51; *Railroad v. McDade,* 191 U. S., 64-68), and also to see that competent and safe men were employed. *Railroad v. Patterson,* 162

U. S., 353, middle of page.   A case very like the one at bar is
*Moore v. Railroad,* 67 C. C. A., 541; 135 Fed., 67.

Where an injury is done which in the ordinary course of
things ought not to happen, there is a presumption of negli-
gence.   *Fitzgerald v. Railroad,* 141 N. C., 539, 540; *Wallace
v. Railroad,* 141 N. C., 664; *Ellis v. Railroad,* 24 N. C., 138.

Whether the deceased was working in the line of his duty
when killed was a question for the jury.   2 LaBatt M. & S.,
sec. 634.

What is a reasonably safe place to work in is for the jury.
*Dorsett v. Manufacturing Co.,* 131 N. C., 254.   It is for the
jury to say whether the train was handled with due care
(*Railroad v. Rymer,* 189 U. S., 468), and as to what would
have been a sufficient train crew.   *Stewart v. Railroad,* 141
N. C., 253; 1 LaBatt M. & S., secs. 204, 205.

As was said in *Biles v. Railroad,* 143 N. C., foot of page 81,
it will be noted that no carelessness is charged against the
deceased in his personal conduct except that of going between
the cars to couple the air hose, and that in going between the
cars he assumed the risk.   Servants never assume risks occa-
sioned by the master's negligence.   *Railroad v. Archibald,* 107
U. S., 665; *Railroad v. McDaniels,* 107 U. S., 454.   Besides,
as said in *Biles v. Railroad, supra,* the defense of assumption
of risk has been eliminated in cases like the one at bar.   The
right of action is given by the statute in such cases.   Also,
*Hudson v. Railroad,* 142 N. C., 198; *Walker v. Railroad,* 135
N. C., 741.

"A case should not be withdrawn from a jury unless the
conclusion follows as a matter of law that no recovery can be
had upon any view which can be properly taken of the facts
the evidence tends to establish."   *Gardiner v. Railroad,* 150
U. S., 360, top of page 361, citing *Railroad v. Ives,* 144
U. S., 408, and *Railroad v. Cox,* 145 U. S., 593, 606.   The
clear and forcible brief of plaintiff's counsel has been used
much in preparing this dissent.

Congress and the State Legislature have passed statutes like the fellow-servant law and others to protect employees of railroads from exposure to unnecessary risks and to diminish the percentage of casualties in that service, which is vastly greater than on European railroads, and therefore, presumably at least, avoidable to some extent. But such statutes are in vain unless there is a thorough investigation by courts and juries of charges of negligence. As to automatic couplers and the block system, we have sustained the right of these men to safe appliances. The dead bumpers were the most serious danger, whose removal was made possible by the adoption of self-couplers. In *Kyles v. Railroad,* 147 N. C., 394, the concurring opinion spoke highly of the fidelity of these men. But they are entitled to more than words of praise. They are entitled to the removal of antiquated and dangerous devices and to compensation for injuries caused by failure to do so.