MILLER v. MICHIGAN CENTRAL RAILROAD CO.

1. MASTER AND SERVANT — NEGLIGENCE — EMPLOYER'S LIABILITY — FEDERAL ACT.

In a suit under the Federal employer's liability statute, 35 U. S. Stat, 65 (U. S. Comp. Stat. §§ 8657-8665), the employer is not made an insurer of the lives of his servants; unless some negligence is proved plaintiff is not entitled to a judgment.

2. SAME—RAILROADS—CUSTOM—PRESUMPTIONS.

Where plaintiff claimed that the defendant railroad company was negligent because it did not cause its freight house door to be enlarged so as to provide for the entrance of unusually large cars, and it appeared that the situation as it existed at the time of the injury had been in existence for thirty years, and the door used during a large part of the time continuously in handling freight cars of this kind, no negligence was disclosed which would entitle plaintiff to a recovery, in the absence of any evidence tending to show that the construction was originally faulty or different from the way in which freight houses of other railroad corporations were constructed.

3. SAME.

Negligence will not be presumed, it must be proved; and operations carried on in the usual manner with the

customary precautions raised no presumption of negligence.

4. SAME—EVIDENCE—NEGLIGENCE—STRUCTURES NEAR TRACK.
    It is well settled that the rules relative to structures erected near railroad tracks on the main line and that applying to structures within the yards are entirely different and create different liabilities.

5. SAME—ASSUMPTION OF RISK—WORKMEN'S COMPENSATION ACT—PERSONAL INJURIES—COMPENSATION.
    The contention that the assumption of risk is not a defense to an action under the Federal act relating to employer's liability is not justified: it has been determined by the United States Supreme Court that the defense was not abolished by the terms of the statute.

6. SAME—RISKS ASSUMED.
    Plaintiff, having knowledge of the existing danger and that the space between the refrigerator cars, which were frequently upon defendant's line, and the door post of the freight house was a narrow one, was charged with the assumption of the risk of being caught between the post of the freight house and a large sized refrigerator car.

Error to Bay; Collins, J. Submitted April 30, 1914. (Docket No. 23.) Decided April 19, 1915.

Case by Susan Miller, as administratrix of the estate of Andrew Miller, deceased, against the Michigan Central Railroad Company for the unlawful killing of plaintiff's intestate. Judgment for plaintiff. Defendant brings error. Reversed; new trial denied.

*Humphrey, Grant & Humphrey,* for appellant.
*Hall & De Foe,* for appellee.

McALVAY, J. In this cause plaintiff brought suit as administratrix of her deceased husband against defendant to recover damages arising from injuries received by him which resulted in his death while in the employ of defendant company, caused, as is claimed,

by the negligence of defendant. The trial of the issue joined in the cause resulted in a substantial verdict in favor of the plaintiff. The case is before this court for review upon errors assigned.

There appears to be but little dispute relative to the material facts involved in this case, which may be stated as follows:

Plaintiff's decedent, at the time of the accident, was employed by defendant as a freight conductor and was working with his crew switching cars in its yard at Bay City, where defendant railroad, which was engaged in interstate commerce, owned and used in its business a freighthouse located near the Saginaw river. This building was about 80 feet wide and 240 feet long, extending in length north and south. It was a substantial frame building, boarded and covered with corrugated iron on the outside. In the center of the north end is an opening 17½ feet high above the top of the steel rails, and about 23 feet wide, through which are laid two parallel gauge tracks, running south into the building parallel with each other about 225 feet. The distance between these tracks is 6 feet 4 inches. Freight cars are run in and out upon them. The east track inside the building will hold six ordinary freight cars. The west track is a little shorter. Sliding doors were hung upon the above-described opening, through which the freight cars were taken in and out upon these tracks. On each side of this opening is a post 10 by 8 inches, resting upon a sill 10 by 10 inches, which forms the framework of the sides of the door. East of the easterly track inside the building is the platform or floor of this freighthouse, 3 feet and 11 inches above the top of the rail, and 3 feet 4 inches east of the easterly rail and parallel with it. This floor is built upon piers, and extends to the east side of the freighthouse and its entire length from the north end to the

freight offices on the south. It is about as high as the floor of the cars standing upon this track. Freight is unloaded from the cars onto this floor, where it is piled up or removed to the outside platform through the east doors. The outside of the door of an ordinary car standing upon this east track would be about 13 inches from the edge of this floor of the freighthouse. The west line of this floor of the freighthouse was flush with the west face of the east post of the north door above described, and they were the same distance from the east rail of the easterly track.

The freight offices of defendant company occupied the entire south end of the freighthouse beyond the snubbing posts at the end of these tracks. The floor of these offices was level with the freighthouse floor. On the west side of the west track there was a floor of the same character as that on the east side just described. There were doors on the east and west sides of the building and also two others doors in the north end, each about 15 feet away from the opening we have above described through which the cars went. The freighthouse is lighted from above by windows set into an elevation in the peak of the roof, making a skylight extending along the entire length of the roof over the freightroom.

Merchants' Dispatch refrigerator cars are somewhat wider than ordinary freight cars, and from measurements given the distance from the face of the east doorpost to the side of such car with the car doors closed is 11 inches. With these car doors opened and hooked back this distance is between 3 and 4 inches. All cars are pushed into this freighthouse on these tracks by a locomotive. On the day of the accident, decedent, as conductor, was placing upon this east track five cars, the middle one of which was a Merchants' Dispatch refrigerator car. These refrigerator

cars had been handled by defendant company in and about this yard and freighthouse for 15 years. By reason of the difference in the height of the freighthouse floor above the car floor, which would not allow refrigerator car doors to be opened inside, it was necessary to open such doors and hook them back before putting them into the freighthouse. These cars had been picked up in the yard by decedent as conductor and Brakeman Jones, who with the engineer and fireman made up this crew, and as they were backed around the curve toward the freighthouse, Jones, because of the curve to the east, to be able to signal the engineer, was riding on the east side of the car, which would first enter the freighthouse. Jones dropped off from the car when it was a few car lengths away from the freighthouse and moving slowly. He saw decedent, who had crossed the yard to the freighthouse, standing east of the east track at the north door. He also saw Raymond, the freighthouse foreman. Decedent, who had full control of this train, gave his signal to stop, which was immediately obeyed. Raymond then broke the seal of the refrigerator car and opened the doors, hooking back one door while Jones hooked the other. This was done in the presence of decedent, who at the time stood within two car lengths, looking at them.

Before backing the cars into the freighthouse it was the conductor's duty to go up to the entrance and call out a warning to the men working inside that cars were to be backed in. Decedent gave this warning, and then signaled to back the train. In answer to this signal the cars started to back up slowly. He was standing not far from this east doorpost, which was the customary and proper place for a conductor to stand when he was placing cars in the freighthouse. He was looking toward the cars when they started to back, and then turned to look inside the freighthouse

for a moment. He then turned his face north toward
the cars, then looked south inside again, when Jones,
who saw him step nearer to the opening, shouted to
him, "Look out for the doors." Decedent turned and
looked at Jones, who was standing near the cars, and
then looked back into the freighthouse. While he
stood in that position he was caught between these
car doors and the post and fatally injured. Jones,
who saw what happened, signaled the engineer to stop
the train, which was done at once. This accident
occurred September 7, 1910, at about 2 o'clock p. m.,
on a bright, clear day. Decedent was at the time en-
gaged in moving this refrigerator car, which con-
tained an interstate shipment. He was an experi-
enced freight conductor, acquainted with all the duties
of such position and with all the conditions and sur-
roundings of the work at this freighthouse, where he
had been engaged in charge of switching operations
continuously for a period of at least six years prior
to the accident, during which time cars like the one
by which he was injured were brought to this
freighthouse every day and night in the same manner
as the one on this occasion.

There were several counts contained in plaintiff's
declaration, all but one of which were abandoned upon
the trial. This count upon which the case was sub-
mitted to the jury was based upon the Federal em-
ployer's liability act. This count charged the breach
of seven distinct duties, which, briefly stated, alleged
negligence on the part of defendant in failing to pro-
vide intestate with a reasonably safe place to work;
failure to provide a suitable depot and all appliances
for the purpose for which they were employed; failure
to build, construct, and maintain freighthouse en-
trances sufficiently large to be reasonably safe while
looking along the sides of moving cars, so that intes-
tate would not be required, when looking into the

freighthouse in order to place the cars, to be in dangerous proximity to open refrigerator car doors; also charging that by reason of such negligence intestate, while employed in interstate commerce, performing his duties in placing cars in this freighthouse, in the exercise of due care, was caught between the open door of a refrigerator car and the side of the entrance to the freighthouse, causing injuries from which he died.

The record shows that during the trial of the case counsel for plaintiff stated, "We do not claim breakage, or anything of that kind," and it is clear from the record that the only claimed negligence alleged and relied upon is that this freighthouse, which was built years before, when freight cars were smaller, did not have an entrance of sufficient width to allow trainmen to stand near it with safety while performing the work of placing these large cars within the freighthouse. This claim is briefly stated in plaintiff's brief, as follows:

"We claim that, when the cars in use on these tracks became of such a size that the trainmen could no longer stand beside the door and do their work in safety, some provision should have been made therefor, either by widening the door, making a window, or other suitable opening through which the men could look in safety, or providing some place where they could stand to do their work without being in constant danger of being struck by cars."

The record shows that this freighthouse and tracks in it were constructed in 1883 in accordance with plans of the engineer of the road, and was in accordance with the general plan of building such freighthouses and tracks for unloading purposes. There was no evidence in the case that any other railroads ever constructed freighthouses and tracks different from this one of defendant. It also appeared that there never before had been an accident at this place.

It appears from the record that at the close of plaintiff's evidence defendant's counsel also rested its case upon the record  as it then stood.  Defendant  then moved the court to direct a verdict in its favor and against plaintiff of no cause of action, for the following reasons:

*First,* that there was no evidence showing, or tending to show, that defendant was guilty of any negligence that tended to cause or produce the accident resulting in the injuries to plaintiff's decedent; *second,* that the happening of the accident could not be considered as evidence of defendant's negligence; *third,* that by the undisputed evidence the accident resulting in the death of plaintiff's decedent occurred as an ordinary risk of the business, and that the risk was assumed by the plaintiff's decedent; *fourth,* that under the undisputed evidence the plaintiff was not entitled to recover.

The court denied this motion and counsel for defendant excepted.  Plaintiff's counsel then elected, as already stated, to go to the jury upon the count based upon the Federal employer's liability act.  Counsel for defendant called the court's attention to the fact that this count charged the defendant with the violation of seven distinct duties, and asked the court to compel counsel for plaintiff to elect upon which of these allegations of negligence they relied.  The court refused to compel such election, and defendant's counsel excepted.  The record also shows that plaintiff's counsel asked to have the jury view the premises where the accident occurred.  To this request defendant's counsel objected.  The court overruled such objection, and ordered the jury taken to the premises for that purpose.  To this ruling and order defendant's counsel excepted.  Counsel for defendant proffered 24 requests to charge, which were refused by the court, and counsel excepted.  A motion for a new trial was made later and refused, and reasons in writing were

filed for denying the same, to which counsel for defendant excepted. The grounds upon which the motion for a new trial was based, other than those contained in the motion for a directed verdict, were: Because the verdict was against the weight of the evidence; because the damages allowed by the jury's verdict were unwarranted and excessive; and because plaintiff's decedent was guilty of contributory negligence.

Although the errors assigned by appellant are quite numerous, all but a few of them have been grouped by counsel for defendant, and those relied upon are considered under two general propositions:

*First,* that neither defendant nor any of its employees were guilty of any negligence causing or tending to cause plaintiff's injury; *second,* that in any event it appears from the record that plaintiff assumed the risk.

These questions are duly raised by errors duly assigned upon exceptions taken to the denial of motions made and to certain portions of the charge of the court and to the refusal to give certain requests to charge proffered by defendant, all in due and sufficient form, so that it will not be necessary to state them at length.

It is the contention of defendant and appellant that the record contains no evidence of negligence on its part. The consideration of this proposition will be much more easily presented when the negligence relied upon by plaintiff is clearly understood. As to the material facts in the case, there is practically no dispute between the parties, and from the statement already quoted from plaintiff's brief it appears that the sole negligence upon which this action is founded is, as already quoted from plaintiff's brief, as follows:

"We claim that, when the cars in use on these tracks became of such a size that the trainmen could

no longer stand beside the door and do their work in safety, some provision should have been made therefor, either by widening the door, making a window, or other suitable opening through which the men could look in safety, or providing some place where they could stand and do their work without being in constant danger of being struck by cars."

This eliminates the consideration of any and all negligence arising from all other sources, and bases the negligence relied upon entirely upon the construction of the tracks and the freighthouse. These tracks and this freighthouse were within the railroad yard of defendant company, and this work which plaintiff's decedent was doing at the time of his injury, while engaged in interstate commerce, was within the same yard. This contention of plaintiff is based upon the claim that the evidence tends to show:

"That it was necessary for decedent to stand where he did and look into the building, and that he was doing this work in both of these particulars in the usual and ordinary manner, and in the only way in which it could be done, or ever had been done, by men of experience in the work, and that no one could stand in the usual and necessary position and look into the building without getting close enough to the cars to be caught as decedent was, unless he succeeded in dodging back every time a wide car or open door approached."

Plaintiff follows this by again stating:

"There was no defect rendering this place unsafe in the sense of anything being broken or out of repair, but the place was defective and insufficient, in that it had become unsafe for and unsuited to the work required to be done."

Plaintiff thereby claiming that the case is within the provisions of section 1 of the Federal employer's liability act (35 U. S. Stat. 65), which provides that a common carrier railroad, while engaged in interstate commerce—

"shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce  *  *  *  for such injury  *  *  *  resulting  *  *  *  by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works,  *  *  * or other equipment."

It is clear from the record that this narrow space between the freighthouse floor and the sides of the cars on this east track, at most but 13 inches wide, was not a sufficient space for the men to stand and work, and plaintiff admits:

"There was no necessity for the men to work inside this building between the platform and the cars, and they were not expected to do so."

The foregoing states fully and at length the theory of plaintiff's case largely as presented to this court in the exact words of counsel.

It is the contention of counsel for defendant that this claim of plaintiff does not state a case which constitutes negligence under the statute upon which this suit is brought; that the record clearly shows this train was not handled upon that day any different from the ordinary and usual way in placing trains and cars in defendant's freighthouse. It may be stated without contradiction that the statute sued upon does not make the employer an insurer of the lives of its servants, and does not give a right of action for which the employer is made liable, unless negligence is shown. The negligence claimed in the instant case deals exclusively with the construction of this freighthouse and these tracks, used in this railroad yard by the defendant for about 30 years exactly in the same manner as it was used upon the day of decedent's injury, and for 15 years of that time used continuously in handling these refrigerator cars, with other cars, all of which appears without dispute. As already stated, the construction of this freighthouse

was upon the plans of the engineer of the road and in accordance with the general plan of building such freighthouses and tracks for unloading purposes. Plaintiff introduced no evidence to show that this was faulty construction, unusual or different from the manner in which freighthouses of other railroad companies were constructed and operated.

Where work is done and cars are switched and handled in the usual and customary way, with the usual precautions, negligence will not be presumed, but it must be proved that such usual manner is in itself improper. This court has so held.

"No negligence was established against the defendant. Gang planks of the same character had been used by the defendant for 15 years, and no accident had before occurred in their use. It cannot be said, as a matter of law, that it was negligence to use such a tool. * * * Defendant was using an appliance which long experience had shown to be safe. The law did not require it to do more." *La Pierre* v. *Railway Co.*, 99 Mich. 212, at page 214 (58 N. W. 60, at page 61).

This claim of plaintiff upon which recovery is based, reduced to its lowest terms, is that for the purposes of present use this freighthouse and these tracks were negligently constructed. It is well settled that the rule relative to structures erected near railroad tracks on a main line and that relative to structures within railroad yards are entirely different as far as liability for negligence by railroad companies to their employees is concerned. We have already stated the only negligence upon which plaintiff relies in the instant case, and have already given in detail the length of time plaintiff's decedent had been engaged in this work at this place, his intimate knowledge of all the surroundings, and the manner in which he for years had performed the identical service in which he was engaged at the time of the accident, his

absolute control at this time of the cars which were being placed within this freighthouse, and his knowledge of the nearness of the east track to the doorpost and floor of the freighthouse. Our conclusion is that from all the evidence in the case no negligence on the part of defendant has been shown.

In a recent opinion handed down by this court, where an employee of a railroad company, who had been injured while riding into a roundhouse on the side of an engine tender of greater width than usual, which left so narrow a space between the side of the engine and the jamb of the door that he was caught and severely injured, and also where the counts in the declaration were predicated upon the liability of defendant under the Federal employer's liability act, as well as the State act, this court said:.

"Liability of a common carrier railroad company, either under the Federal or State act, to its employees in case of injury, must be based upon some negligent act of the railroad company. * * * We are of opinion that the failure of the defendant to notify plaintiff of the danger in riding the tender into the roundhouse in the position assumed by him at the time of his injury was not negligence. The danger of assuming such a position upon any of the engines was an obvious one." *Hollingshead* v. *Railway Co.*, 181 Mich. 547 (148 N. W. 171).

This court also in the same case holds as follows:

"The rule which protects railroad employees from the existence of structures upon the right of way too close to the track is not applicable in a case of this character" (citing and quoting at length from *Hogan* v. *Railroad Co.*, 209 N. Y. 20 [102 N. E. 555]).

2. In answer to the appellant's contention that in this case plaintiff's decedent assumed the risk of his injury, plaintiff insists that the defense of assumption of risk is not available in actions for personal injuries brought under the Federal employer's liability act,

arguing, not only that it is abrogated by the terms of the statute, but also that the statute, being remedial in character, should be construed to advance the remedy. The case was submitted to the jury by the trial court upon plaintiff's theory.

Plaintiff further claimed at the time the case was submitted to this court that the question had not been passed upon by the Supreme Court of the United States, and that the weight of the authorities of the States and the Federal circuit courts of appeals favored the contention. An examination of the Federal authorities satisfies us that at that time there were indications in several opinions of the Federal Supreme Court of a contrary view. Later that court, in deciding the case of *Seaboard, etc., Railway* v. *Horton*, 233 U. S. 492, 34 Sup. Ct. 635, distinctly held that the defense of assumption of risk was available. That case came into the United States Supreme Court from the supreme court of the State of North Carolina. It was a case brought under the Federal employer's liability act by plaintiff to recover damages for personal injuries sustained by him while engaged in interstate commerce, such injuries claimed to have been caused by the negligence of defendant in furnishing a defective water gauge for the steam boiler of his engine. On account of the importance of this case as the first positive utterance of that court, in construing the Federal employer's liability act, bearing upon the issue of assumption of risk, we have quoted practically the entire opinion bearing upon the question. Mr. Justice Pitney delivered the opinion of the court. After a brief statement of the facts in the case, and denying three motions to dismiss the writ of error as technical and without merit, the court said:

"Coming now to the merits, we need consider only certain assignments of error that are based upon exceptions to the action of the trial judge in giving and refusing to give instructions relating to the issues of

defendant's negligence, the assumption of risk, and contributory negligence.

"At the outset we observe that the judge evidently misapprehended the effect of the Federal act upon State legislation. Thus the jury was told that plaintiff had brought the action under the Federal statute; 'And where Congress enacts a law, within the limits of its power, that law should be enforced uniformly throughout the entire United States. If it is in conflict with the State law, the State law is superseded. But where there is no conflict expressed by the statute of the United States, then the rule of the State prevails.' This, of course, in the absence of a specific statement of the applicable rule of the State law, might be treated as academic. But the theory was carried into the specific instructions, to the extent that upon the questions of the employer's duty and the assumption of risk by the employee, the charge was modeled rather upon the North Carolina statute than upon the act of Congress. *   *   *

"Upon the issue of defendant's negligence, ·the trial court charged the jury as follows: 'It is the duty of the defendant to provide a reasonably safe place for the plaintiff to work, and to furnish him with reasonably safe appliances with which to do his work.' And in various other forms the notion was expressed that the duty of defendant was absolute with respect to the safety of the place or work and of the appliances for the work. Thus: 'If you find from the evidence that it [the locomotive engine] was turned over to him without the guard, and if you further find from the evidence that the guard was a proper safety provision for the use of that gauge, and that it was unsafe without it, then the defendant did not furnish him a safe place and a safe appliance to do his work, and if it remained in that condition it was continuing negligence on the part of the defendant, and if he was injured in consequence thereof, if you so find by the greater weight of the evidence, you should answer the first issue "Yes." '

"In these instructions the trial judge evidently adopted the same measure of responsibility respecting the character and safe condition of the place of work, and the appliances for the doing of the work, that is prescribed by the local statute. But it is settled that

since Congress, by the act of 1908, took possession of the field of employer's liability to employees in interstate transportation by rail, all State laws upon the subject are superseded. *Second Employer's Liability Cases*, 223 U. S. 1, 55 [32 Sup. Ct. 169, 38 L. R. A. (N. S.) 44].

"The act is quoted in full in that case at page 6 (at page 169 of 32 Sup. Ct., 38 L. R. A. [N. S.] 44). By its first section a right of action is conferred (under conditions specified) for injury or death of the employee 'resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.'

"This clause has two branches: the one covering the negligence of any of the officers, agent, or employees of the carrier, which has the effect of abolishing in this class of cases the common-law rule that exempted the employer from responsibility for the negligence of a fellow employee of the plaintiff, and the other relating to defects and insufficiencies in the cars, engines, appliances, etc. But, plainly, with respect to the latter as well as the former ground of liability, it was the intention of Congress to base the action upon negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence. The common-law rule is that an employer is not a guarantor of the safety of the place of work or of the machinery and appliances of the work; the extent of its duty to its employees is to see that ordinary care and prudence are exercised, to the end that the place in which the work is to be performed and the tools and appliances of the work may be safe for the workmen. *Hough* v. *Railway Co.*, 100 U. S. 213-217; *Washington, etc., R. Co.* v. *McDade*, 135 U. S. 554-570 [10 Sup. Ct. 1044]; *Choctaw, Oklahoma, etc., R. Co.* v. *McDade*, 191 U. S. 64-67 [24 Sup. Ct. 24]. To hold that under the statute the railroad company is liable for the injury or death of an employee resulting from any defect or insufficiency in its cars, engines, appliances, etc., however caused, is to take from the act the words 'due to its negligence.' The plain effect of

these words is to condition the liability upon negligence; and, had there been doubt before as to the common-law rule, certainly the act now limits the responsibility of the company as indicated. The instructions above quoted imposed upon the employer an absolute responsibility for the safe condition of the appliances of the work, instead of limiting the responsibility to the exercise of reasonable care. In effect, the jury was instructed that the absence of the guard glass was conclusive evidence of defendant's negligence. In this there was error.

"The questions more particularly discussed, however, and upon which the decision seems to have turned in the supreme court of North Carolina, pertain to the issues of assumption of risk and contributory negligence. By section 3 of the act of 1908 it is declared that: 'The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.' And by section 4: 'Such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier * * * contributed to the injury or death of such employee.' By the phrase 'any statute enacted for the safety of employees,' Congress evidently intended Federal statutes (citing such statutes). For it is not to be conceived that, in enacting a general law for establishing and enforcing the responsibility of common carriers by railroad to their employees in interstate commerce, Congress intended to permit the legislatures of the several States to determine the effect of contributory negligence and assumption of risk, by enacting statutes for the safety of employees, since this would, in effect, relegate to State control two of the essential factors that determine the responsibility of the employer.

"It seems to us that section 4, in eliminating the defense of assumption of risk in the cases indicated,

quite plainly evidences the legislative intent that in all other cases such assumption shall have its former effect as a complete bar to the action. And, taking sections 3 and 4 together, there is no doubt that Congress recognized the distinction between contributory negligence and assumption of risk; for, while it is declared that neither of these shall avail the carrier in cases where the violation of a statute has contributed to the injury or death of the employee, there is, with respect to cases not in this category, a limitation upon the effect that is to be given to contributory negligence, while no corresponding limitation is imposed upon the defense of assumption of risk—perhaps none was deemed feasible.

"The distinction, although simple, is sometimes overlooked. Contributory negligence involves the notion of some fault or breach of duty on the part of the employee, and since it is ordinarily his duty to take some precaution for his own safety when engaged in a hazardous occupation, contributory negligence is sometimes defined as a failure to use such care for his safety as ordinarily prudent employees in similar circumstances would use. On the other hand, the assumption of risk, even though the risk be obvious, may be free from any suggestion of fault or negligence on the part of the employee; the risks may be present, notwithstanding the exercise of all reasonable care on his part. Some employments are necessarily fraught with danger to the workmen—danger that must be and is confronted in the line of his duty. * * * And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These definitions have been recognized and applied in numerous decisions of this court (citing cases).

185 Mich.—29.

"When the employee does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment, without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employee assumes the risk even though it arise out of the master's breach of duty. If, however, there be a promise of reparation, then during such time as may be reasonably required for its performance, or until the particular time specified for its performance, the employee, relying upon the promise, does not assume the risk, unless at least the danger be so imminent that no ordinarily prudent man under the circumstances would rely upon such promise (citing cases).

"In the light of these principles, the rulings of the trial court in the case at bar must be considered.

"Defendant specifically requested an instruction that plaintiff's right to recover damages was to be determined by the provisions of the Federal act, and that: 'If you find by a preponderance of evidence that the water glass on the engine * * * was not provided with a guard glass, and the condition of the glass was open and obvious and was fully known to plaintiff, and he continued to use such water glass with such knowledge and without objection, and that he knew the risk incident thereto, then the court charges you that the plaintiff voluntarily assumed the risk incident to such use, and you will answer the second issue, "Yes." ' The court gave this instruction as applicable to the issue of contributory negligence, and instead of the words 'then the court charges you that the plaintiff voluntarily assumed the risk incident to such use, and you will answer the second issue "Yes," ' used the words, 'then the court charges you that the plaintiff was guilty of contributory negligence, and you will find the third issue "Yes." ' To the refusal to give the instruction as requested, and the modification of it, defendant excepted.

"The trial court evidently deemed, as did the State supreme court, that the topic of assumption of risk, with reference to the circumstances of the case, was sufficiently and properly covered by the instruction actually given, as follows: After stating in general terms that 'a man assumes the risk, when he takes

employment, incident to the class of work which he is to perform,' but that 'he does not assume the risk incident to the negligence of his employer in providing machinery and appliances with which he is to work,' the court proceeded as follows:

"'On the other hand, the employer has the right to assume that his employee will go about the work in a reasonably safe way, and give due regard to the machinery and appliances which are in his hands and under his control, and if you should find from the evidence, by its greater weight, because the burden in this instance is on the defendant, that the plaintiff knew of the absence of the guard or shield to the water gauge and failed to give notice to the defendant, * * * whose duty it was to furnish the water gauge and appliance, and he continued to use it without giving that notice, *it being furnished to him in a safe condition,* then he assumed the risk incident to his work in the engine with the glass water gauge in that condition, although he might have handled his engine in every other respect with perfect care.' (Italics ours.)   (The above italics are those of the Federal Supreme Court.)

"It will be observed that by this instruction the application of the rule of assumption of risk was conditioned upon the jury finding that the water gauge, when furnished to the plaintiff, was in a safe condition.   Here again the court appears to have followed the local statute, rather than the act of Congress; for section 2646, Nor. Car. Revisal 1905, already quoted, has been held by the State supreme court to abolish assumption of risk as a bar to an action by a railroad employee for an injury attributable to defective appliances furnished by an employer.   *Coley* v. *Railroad Co.,* 128 N. C. 534 [39 S. E. 43, 57 L. R. A. 817].   The trial court, while recognizing that the act of Congress applied so far as its terms extended, but that by its terms the employee is not to be held to have assumed the risk in any case where the violation by the carrier of a statute enacted for the safety of employees contributed to the injury, at the same time held that, since no statute had been enacted covering such an appliance as the water glass gauge, the rights of plaintiff were such as he would have had under the State law.   An instruction to the jury to

this effect preceded the instructions we have just quoted.

"It is true that such an appliance as the water gauge and guard glass in question is not covered by the provisions of the safety appliance act [27 U. S. Stat. 531 (U. S. Comp. Stat., §§ 8605-8612)], or any other law passed by Congress for the safety of employees. * * * But the necessary result of this is, not to leave the employer responsible for the consequences of any defect in such appliance, excluding the common-law rule as to assumption of risk, but to leave the matter in this respect open to the ordinary application of the common-law rule. The adoption of the opposite view would, in effect, leave the several State laws, and not the act of Congress, to control the subject-matter.

"By the instruction as given the application of the rule of assumption of risk was confined to a single hypothesis that the jury should find the guard glass was in position when the engine was delivered to plaintiff on the morning of July 27th. This, as already pointed out, was one of the questions in dispute, plaintiff having testified that the guard glass was missing at that time, while his fireman testified (and in this was corroborated by circumstantial evidence) that it was in place at that time, and was subsequently broken. But by the common law, with respect to the assumption by the employee of the risk of injuries attributable to defects due to the employer's negligence, when known and appreciated by the employee and not made the subject of objection or complaint by him, it is quite immaterial whether the defect existed when the appliance was first placed in his charge or subsequently arose. Hence, if the guard glass was missing when plaintiff first took the engine, as he testified, and he, knowing of its absence and the consequent risk to himself, continued to use the water gauge without giving notice of the defect to the defendant or its representative, he assumed the risk.

"Defendant was entitled to have the requested instruction given respecting assumption of risk; and, as the charge actually given did not cover the same ground, there was error. * * *

"The judgment of the supreme court of North Carolina must be reversed, and the cause remanded for

further proceedings not inconsistent with this opinion."

In plaintiff's brief it is admitted:

"If the common-law doctrine of assumed risk is applicable in this case, it was improperly submitted to the jury under the charge as given, as the trial court was of the opinion that there was no assumption of risk in any case where the statute created liability."

This question of assumed risk has been decided by the Supreme Court of the United States against the contention of plaintiff in *Seaboard, etc., Railway* v. *Horton, supra.* It follows that no further discussion is necessary. The trial court was in error in not granting defendant's motion, made at the close of plaintiff's case, for an instructed verdict in its behalf, both upon the ground that no negligence on the part of defendant was shown, and also that plaintiff's decedent assumed the risk of his injury.

The judgment of the circuit court is reversed, and no new trial is granted.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.