WUDLICK *v.* CHICAGO & NORTHWESTERN RAILWAY CO.

1. MASTER AND SERVANT — PERSONAL INJURIES — NEGLIGENCE—DIRECTED VERDICT.

In an action against a railroad company for personal injuries received by plaintiff, one of its section hands, while attempting to pass under a steam shovel being operated by another company, evidence that plaintiff was going after some tools where they had been left the night before by order of his foreman, that he was not directed to reach the tools the way he took, and that there were other ways he could have taken and reached them in safety, *held*, sufficient to support a directed verdict for defendant, there being no evidence of negligence on its part.

2. SAME—WORKMEN'S COMPENSATION ACT — FEDERAL EMPLOYERS' LIABILITY ACT—NEGLIGENCE—DEFENSES.

Although defendant had not elected to come under the workmen's compensation law, plaintiff cannot recover under either the Federal or State law unless some negligence on the part of defendant is shown.

Error to Gogebic; Cooper, J. Submitted October 24, 1918. (Docket No. 46.) Decided December 27, 1918.

Case by Vinco Wudlick against the Chicago & Northwestern Railway Company for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*James A. O'Neill,* for appellant.

*Frank A. Bell,* for appellee.

The plaintiff in this case, a man 51 years of age, had been employed by the defendant railway company as a section hand for nine months prior to the time he received the injury which constitutes the basis

of this action. Prior to his employment by the defendant he had worked for about two years in the woods. He was injured on the 11th day of October, 1916, under the following circumstances: The defendant railway carried ore from the premises of the Newport Mining Company. To facilitate such operation the Newport Mining Company maintained and operated at its stock pile a large 60-ton Bucyrus steam shovel with which it loaded the ore upon cars furnished by the defendant railway company. The stock pile ground was between 600 and 700 feet long, running north and south, and from 100 to 150 feet wide, east and west. The steam shovel was operated along the easterly edge of the stock pile from south to north upon temporary tracks which, as it advanced north, would be brought from the rear and attached in front. The loading track upon which the cars of the defendant company stood while being loaded by the steam shovel was placed from 15 to 18 feet east of the line upon which the shovel operated northerly. After the steam shovel had operated through the stock pile to its northerly extremity it would be returned to the southerly end of the stock pile and again repeat the operation. This change in the location of the steam shovel would necessitate the shifting to the west of the temporary loading track used by the defendant railway company to place its cars during the process of loading. On the day preceding the accident to the plaintiff, he, with some 15 or 20 other section hands, had been engaged in the operation of moving the temporary loading track to the west so that the steam shovel, which was in position to continue the loading process, might reach defendant's cars. Plaintiff and his fellow workers had worked an hour overtime on the night of the 10th of October in order to complete the shifting of the track but had not been able to quite finish the job. Plaintiff said:

"We was pretty near through, but we had some blocking to be done under the ties."

At 7 o'clock on the night of the 10th the workmen were instructed to leave their tools where they were and go home. The next morning, October 11th, plaintiff and the other members of the gang met according to custom at the car house and were there instructed by the foreman to go to the Bonnie mine where they had left their tools overnight and to proceed from there to the Pabst mine where there was a job for them to do. The distance between the car house where this order was given and the point at the Bonnie mine where they had left their tools was nearly a mile, and there were several routes between the two points which the men might take. Plaintiff and three of his companions chose a certain route which caused them to approach the stock pile from the west. This brought the steam shovel between them and the loading track some 15 or 18 feet east of the line upon which the steam shovel stood. The exact time at which the accident occurred is not clear, but it was apparently some time between 7:15 and 8 o'clock in the morning. In the meantime the defendant railway company had placed empty cars upon the loading track east of the steam shovel and when the four men, including the plaintiff, approached the steam shovel from the south and west, it was in operation loading the cars to the east. Plaintiff described the accident as follows:

"When I got in sight of the steam shovel with Povlak ahead, Mike second and I coming third, I saw this Charley Povlak and Mike Wesilich going through and I seen the dipper way up and I thought I was going to be safe and I started through myself. Mike Wesilich and Povlak passed through in front of the shovel. They went through all right then after I seen Charley Povlak and Mike Wesilich went through, I thought I was going to be safe and I started through. Just as I got through, the dipper came down and squeezed

me and I heard the craneman holler. That is all I could hear. I fell down and I heard the craneman holler. When I first came in sight of the steam shovel that morning, I seen the engineer or whatever you call him. He was inside the shovel where he belonged. He was sitting down to his place where he belonged. I seen those two fellows go through and I started to go through myself. I don't know just exactly which way he was looking. I thought to myself that he was looking down, but I didn't watch him very much; I wanted to get by. The dipper was up in the air at that time.

"Q. Was it moving when you saw it first?

"A. No.

"Q. And when was the first time that you knew that they were using the shovel, that it was moving?

"A. I never seen the shovel in motion but the time that I got at the shovel, and after I was injured I didn't know anything. It was daylight at that time.

*    *    *

"I went through in front of the steam shovel to get my tools because I seen Charley Povlak and Mike Wesilich go through and I had to go because they went through. I go through there just because I had to go 1,000 feet either way around until I would reach my tools; 1,000 feet either way, north or south or whatever it is."

The operator of the steam shovel was sworn by the plaintiff and examined under the statute. He described the shovel as being a structure from 30 to 35 feet long with a frame 5 feet 7 inches wide and a boom extending in front 35 or 40 feet to which was attached a bucket carrying two and one-half cubic yards. He testified that when in operation the bucket would make four round trips from the stock pile to the cars in one minute; that in operation the engine made a noise which could be heard from 100 to 1,000 feet away; that it was his duty in the operation of the shovel to keep his eyes upon movements of the crane and bucket and that from his position upon the shovel and by reason of the intervening portions of the struc-

ture it was difficult for him to see any one attempting to pass in front of the shovel; that in any event he did not see either plaintiff or his companions attempting to pass in front.

In commencing this action plaintiff joined the Newport Mining Company and the operator of the steam shovel as parties defendant. At the conclusion of the testimony, on motion of his own counsel, he was permitted to enter a nonsuit in favor of the mining company and the shovel operator. A motion was then made on behalf of the defendant railway company for the direction of a verdict upon various grounds and a verdict was so directed by the learned trial judge upon the ground that plaintiff's testimony, given its most favorable construction, failed to show any actionable negligence upon the part of the defendant. In reviewing the case in this court plaintiff claims:

"1. That the question of the defendant's negligence in sending plaintiff into a dangerous place without warning him of the danger, and in failing to furnish him a reasonably safe place for the performance of the work required of him, was for the jury.

"2. That, the defendant not having elected to come under the workmen's compensation act, the defenses of the plaintiff's contributory negligence or assumption of risk, were not open to it."

BROOKE, J. (*after stating the facts*). Plaintiff himself testified:

"We left our tools between the shovel and the railroad cars 35 feet away from the shovel to the north."

Frank Malko, one of the three men who accompanied him at the time he was hurt, testified:

"We left our tools at the place we was working, about 300 feet or maybe more from the steam shovel."

Plaintiff as well as other witnesses sworn in his behalf testified that there were other ways in which they could reach the point where their tools lay in

perfect safety.   Whether the tools were lying at a point 35 feet from the shovel or 300 feet therefrom would seem to be unimportant as in either event they were in a safe place.. It cannot be claimed on behalf of plaintiff that he was ordered to reach his tools along the way he took nor can it be said that any custom existed which made it necessary or proper for him to follow that extremely hazardous course.   He was accustomed to working in the immediate vicinity of steam shovels and must be held to have had knowledge of the danger attendant upon his act.   This is not asserted as bearing upon plaintiff's assumption of the risk of injury from his act, but in its relation to the question of defendant's negligence.   It is clear that plaintiff cannot recover against defendant either under the Federal or State law unless some negligence on the part of the defendant is shown.   *Lydman* v. *DeHass*, 185 Mich. 139, and *Miller* v. *Railroad Co.*, 185 Mich. 432.

We have no hesitation in holding that the verdict in this case was properly directed.

BIRD, MOORE, STEERE, FELLOWS, STONE, and KUHN, JJ., concurred.   OSTRANDER, C. J., did not sit.